Janet Sue **JOHNSON**, Plaintiff
and Appellant,

v.

Val Budge **JOHNSON**, Defendant
and Respondent.

No. 870241–CA.

Utah Court of Appeals.

March 8, 1989.

Stephen W. Farr (argued), Farr, Kaufman, & Hamilton, Ogden, for plaintiff and appellant.

Neil B. Crist (argued), Hansen, Crist & Spratley, Bountiful, for defendant and respondent.

Before BILLINGS, GARFF and JACKSON, JJ.

OPINION

JACKSON, Judge:

Appellant, Mrs. Johnson, seeks reversal or readjustment of the property division, alimony, and child support awarded to her upon divorce. We affirm the trial court's disposition of property, and reverse and remand the alimony and child support awards for further consideration.

Appellant's brief does not cite to the record in support of her Statement of Facts, as required by our rules. *See* R. Utah Ct.App. 24(a). Respondent's brief has a Statement of the Case, containing facts, but no Statement of Facts. Appellant provides little analysis and cites no

authority supporting her claim that the "proper" method of valuation of Dr. Johnson's interest in a professional corporation was that used by her expert. On the other hand, Dr. Johnson asserts that Utah appellate cases reject her expert's valuation method. But, in the cases he cites—*Dogu v. Dogu*, 652 P.2d 1308 (Utah 1982), *Olson v. Olson*, 704 P.2d 564 (Utah 1985), and *Petersen v. Petersen*, 737 P.2d 237 (Utah Ct.App.1987)—the method of valuing a party's interest in a professional corporation was not at issue. Nevertheless, with this caveat, we undertake disposition of the appeal.

The parties married in 1966, following Dr. Johnson's first year of medical school. Mrs. Johnson had a Bachelor's Degree in business. While he was in medical school, she worked, thereby supplying $14,000 to the marriage. He earned about $3,500 during that time. His parents paid for tuition and books. During his one-year internship, both worked. After 1970, she did not work outside the home. The parties have three children. After twenty years of marriage they separated, having enjoyed an affluent standard of living. They stipulated to an equal division of real and personal property, yielding $428,000 for her and $428,000 for him. Each party received over $200,-000 of income-producing personal property. The parties reserved for court determination the following: (1) whether she was entitled to an award of one-half his medical license as property; (2) the value of his ownership interest in Associates of Pathology, a professional corporation; and (3) whether she was entitled to a lump sum award of one-half of his income between separation and divorce. We turn now to these property issues and will treat the alimony and child support issues thereafter.

■ First, should we overturn *Petersen v. Petersen*, 737 P.2d 237 (Utah Ct.App. 1987), and *Rayburn v. Rayburn*, 738 P.2d 238 (Utah Ct.App.1987), and hold that a professional license or degree is property subject to division upon divorce? We choose not to overrule those decisions and reaffirm that neither the professional degree nor the license is property, for the reasons stated in those opinions.

■ Second, did the trial court err when it found the value of Dr. Johnson's ownership interest in Associates of Pathology to be $14,521?

We will not disturb the lower court's findings unless they are clearly erroneous or we are convinced a mistake has been made. Utah R.Civ.P. 52(a); *Western Kane County Spec. Serv. Dist. No. 1 v. Jackson Cattle Co.*, 744 P.2d 1376 (Utah 1987). The lower court issued a detailed Memorandum Decision and adopted a number of specific findings based thereon. The court found:

13. That the articles of incorporation of defendant's employer, the Associates of Pathology, are actually little more than a partnership at will.

14. That the buy-out agreement fixed the buy-out figure as a proportional share of fixed assets.

15. That there is no fixed contract of employment with the hospitals served by the aforesaid corporation; it is a going rate situation.

16. That each doctor within the aforesaid professional corporation bills the hospital and/or the other clients for services rendered and the money is eventually divided equally.

17. That the market place has provided substitute or new doctors. New doctors come in substantially in the same position as the doctors leaving said corporation. The rates charged by each pathologist are identical to the others and there is no specific reward for seniority or length of service.

18. That the value of defendant's interest in the Associates of Pathology, a professional corporation, is $14,521.00.

19. That one of the flaws in plaintiff's calculation of the value of defendant's medical degree is the assumption that the defendant's income would increase each year by a fixed percentage.

Mrs. Johnson's experts prepared four different valuations of the business, and then chose one. They summarized their methods as a computation of the difference in

Dr. Johnson's earning power when compared to other pathologists in general, that is, the present value of his extra earning power over the balance of his career. That amount would be the "market price" that a willing buyer would pay to replace Dr. Johnson in the corporation. The chosen valuation method measured extra earning power for the previous four years compared to the average pathologist and adjusted for inflation. That comparison showed each member of the business earns about $50,000 more than the average of pathologists in the United States. They determined how much someone would pay for the opportunity to step into that position. They considered that extra earning power Dr. Johnson would enjoy by continuing to earn more than average, then applied five as a capitalization rate—which they considered conservative. Finally, the amount computed was discounted by one-third to a buyer because each member has a minority interest. An adjustment for a buyer's tax considerations was also applied. This method or process yielded $154,997 as the "fair market value" of Dr. Johnson's share of Associates of Pathology.

On cross-examination, Mrs. Johnson's experts stated that the $82,000 average pathologist's income which they used was for the year 1982 and they were not sure whether the figure included contributions to pension and profit-sharing plans. On redirect, they stated they "believed" all comparative numbers were with all associated benefits.

Dr. Johnson's expert identified the following problems with the foregoing methodology: (1) The marketplace had recently provided a buyer for Dr. Eason's interest who had paid no consideration for excess earnings. (2) The business sold services to primarily one purchaser, St. Benedict's Hospital, and over the last three years the hospital had unilaterally reduced payments by $72,000 by eliminating a Medical Directorship held by the business. (3) He calculated the pathologists' current income to be below the U.S. average, so no excess earnings existed. (4) The government pathologist salary figures excluded pension and profit-sharing payments. (5) Her experts used hospital and Health Maintenance Organization data, while this is a specific practice in Ogden, Utah. National averages tend to distort the value of highly specialized practices. On cross-examination, he concluded that the market value was what had actually been paid in arms-length transactions, and that $14,521 (the total value divided by four corporation shareholders) was all Dr. Johnson could receive under the buy-out agreement.

The capitalization formula used by Mrs. Johnson's primary expert to compute the fair market value of the Associates of Pathology stock yielded a substantial amount for intangible assets, i.e., goodwill. However, the trial court did not find his testimony credible and did not accept his stock valuation. On the other hand, the doctor's expert relied on a recent sale of the corporate stock in which a new doctor had paid a price that did not include any value of goodwill. Instead, the price was calculated in accordance with the buy-sell agreement negotiated by Dr. Johnson and other shareholders, in which Dr. Johnson had contracted away any right to share in the business's goodwill, if any existed. *Cf. Hertz v. Hertz*, 99 N.M. 320, 657 P.2d 1169 (1983) (trial court's valuation of law firm goodwill restricted by nonfraudulent professional shareholder agreement valuing goodwill at $1.00). There was no evidence this agreement was entered into to deprive Mrs. Johnson of her share of marital property. Thus, the trial court adopted the valuation by Dr. Johnson's expert, who did not include any value for goodwill.

This court has recently held that goodwill can exist in a professional practice. *See Sorensen v. Sorensen*, 769 P.2d 820 (Ct.App.1989). There, the majority recognized the existence of goodwill in a solo dental practice. The dissent recognized that goodwill may exist, under a narrower definition, in some professional business organizations, but not in Dr. Sorensen's particular practice.

We find substantial evidence in the record supporting the business value finding of the court. The finding is therefore not clearly erroneous and we are not con-

vinced a mistake has been made. Moreover, the trial court made specific findings concerning the credibility of the expert witnesses:

4. That plaintiff's expert witnesses lack credibility regarding the values placed on defendant's interest and stock with the Associates of Pathology and regarding the value of his medical degree.

5. That defendant's expert witness has high credibility regarding the value of defendant's interest and stock in the Associates of Pathology as well as his earnings as a medical doctor.

Under Utah Rule of Civil Procedure 52(a), we defer to the trial court's determination of the credibility of witnesses. We see no reason in the record to disagree with the judgment of the trial court judge, who was in the arena and observed the combatants in person. Accordingly, we affirm the business value finding herein.

■ Third, Mrs. Johnson claims she should have received fifty percent of Dr. Johnson's income during the fourteen months between separation and divorce. Her argument on this point is limited to one page without citation of any legal authority or reference to the record. She "maintains she should be awarded an equitable interest in [his] post-separation income as that income was an asset of the marriage and the parties agreed in the stipulation that all assets of the marriage should be divided equally." But, we do not see post-separation income listed, as property or otherwise, on the stipulation exhibit. The trial court found that she "should not be entitled to any portion of Defendant's 1986 or 1987 bonus inasmuch as these are considered as part of Defendant's overall annual income." If that income was not used for family support, including the temporary support payments, then it was accumulated and divided pursuant to the property stipulation. Moreover, she has not presented any evidence that this income was placed in some hidden asset and not accounted for in the decree. The finding of the trial court is affirmed.

■ Next, we turn to the alimony award. Mrs. Johnson's principal assertion is that "the trial court made no reference to any of the three factors mentioned in *Jones* [*v. Jones,* 700 P.2d 1072, 1075 (Utah 1985)], but only discussed the [sic] Mr. Johnson's ability to provide support." We agree with this contention. The court did make findings:

That the earnings of the defendant has [sic] leveled off at the present rate for the expected future. The projected income for the defendant for 1987 including salary and bonus is between $127,000 and $132,000 which income level is expected to remain constant in the ensuing few years.

. . . .

That the earnings of the defendant as well as his future potential have been considered by the court for the purpose of fixing alimony.

These findings are adequate concerning the ability of Dr. Johnson to provide support, but there are no findings concerning the financial condition and needs of Mrs. Johnson. The property award provides an indication of financial condition, but there is nothing definitive about the effect. The court made no finding concerning her needs, although there was some evidence thereof. The court did make a finding that the parties spent less for support while together than the need indicated by the judicial district's support guideline. The ability of Mrs. Johnson to support herself is not treated in the findings other than (1) "[she] did obtain a college degree in business from Weber State College prior to her marriage to defendant," and (2) she had worked three years after marriage, but not for the last seventeen years. There is no finding concerning her earning capacity, which would provide a baseline for modification purposes. *See Higley v. Higley,* 676 P.2d 379, 382 & n. 1 (Utah 1983); *Canning v. Canning,* 744 P.2d 325 (Utah Ct.App. 1987). Nevertheless, the court concluded:

That plaintiff's circumstances should not be considered to have changed for purposes of modifying alimony awarded herein so long as her earnings do not exceed $1400 per month.

Thus, we are unable to review the adequacy of the findings to support the conclusion that "the defendant should pay to plaintiff as and for alimony $1,000 per month." Nor do we find any evidence or finding relevant to the conclusion that "said alimony should be paid to plaintiff for a period of ten years." There is nothing indicating any particular significance to that period of time. Nor is there any support for the finding of $1,400 in earnings as a modification baseline.

Accordingly, we reverse and remand for additional findings concerning: (1) Mrs. Johnson's needs; (2) her ability to provide for herself, including an earning capacity baseline; (3) elimination of the ten-year cap on alimony; (4) a separate finding concerning income which will flow to both parties from the respective properties awarded; and (5) an alimony award consistent with those findings.

■ Finally, we turn to the child support issue. The parties stipulated to the use of the Second District child support guidelines. But, they proceeded to argue about application of the guidelines due to Dr. Johnson's high income level, which went off the top of the chart. Thus, the stipulation failed, and the guideline should not have conclusively determined the $648 per month child support without regard to the evidence. The guideline might have some probative value, but should not be controlling. Again, Mrs. Sorensen's brief contains four pages of argument, but not a single citation of legal authority. In *Jefferies v. Jefferies*, 752 P.2d 909 (Utah Ct.App. 1988), defendant argued that the court

should consider seven factors in setting prospective child support, as provided in Utah Code Ann. § 78–45–7 (1987).[1] There, we stated that the trial court must enter findings of fact on the relevant factors. *Jefferies*, 752 P.2d at 911. With proper findings, we defer to the trial court unless they are clearly erroneous. *State v. Walker*, 743 P.2d 191, 193 (Utah 1987). However, without findings, we must reverse unless the evidence is clear, uncontroverted, and capable of supporting only a finding in favor of the judgment. *See Jefferies*, 752 P.2d at 911. We noted above the lack of findings regarding the economic circumstances of the parties to support the alimony award. Some of the necessary findings are the same under both the alimony and child support issues. We need those plus the additional findings required by *Jefferies*. Accordingly, we reverse and remand for proper child support findings and an award of child support consistent with those findings.

In summary, we affirm the judgment with respect to all property issues, but reverse and remand for proper findings and further consideration of the alimony and child support awards.

BILLINGS and GARFF, JJ., concur.

---

**1.** (2) When no prior court order exists, or a material change in circumstances has occurred, the court, in determining the amount of prospective support, shall consider all relevant factors including but not limited to:

  (a) the standard of living and situation of the parties;

  (b) the relative wealth and income of the parties;

  (c) the ability of the obligor to earn;

  (d) the ability of the obligee to earn;

  (e) the need of the obligee;

  (f) the age of the parties;

  (g) the responsibility of the obligor for the support of others.

Utah Code Ann. § 78–45–7(2) (1987).