**STATE of Utah, Plaintiff and Respondent,**

v.

**James V. CRESTANI, Defendant and Appellant.**

**No. 870525–CA.**

Court of Appeals of Utah.

March 30, 1989.

John F. Clark, Salt Lake City, for defendant and appellant.

Gregory Bown, David L. Wilkinson, Salt Lake City, for plaintiff and respondent.

Before BILLINGS, DAVIDSON and GARFF, JJ.

## OPINION

GARFF, Judge:

Defendant/appellant, James V. Crestani, appeals his conviction of four counts of second degree felony theft and denial of his motion for a new trial. We reverse and remand for a new trial.

Appellant was the sole stockholder of the Alta Title Company (Alta). On February 10, 1982, appellant opened a commercial money market demand checking account (MMD-2), at Sandy State Bank in Sandy, Utah, on behalf of Alta. MMD-2 was one of several accounts Alta used until it ceased doing business in March 1983. A large amount of money flowed through this account; from March through August 1982, $9,448,613.44 was deposited and $9,579,594.90 was withdrawn. During its thirteen month existence, MMD-2 was used as a customer account, a deposit account for contract service fees due to appellant, and appellant's personal account.

On March 14, 1985, a five count information was filed charging appellant with theft of $57,300.00 from MMD-2 during the period of May 7 to August 13, 1982. The gist of the information was that, on five occasions, appellant had withdrawn funds from MMD-2 and used them for his personal benefit, and that this conduct constituted theft because MMD-2 should have been used exclusively for funds held in escrow by Alta for real estate closings.

Shortly after the information was filed, appellant approached attorney Phil L. Hansen to conduct his defense. Hansen agreed to do so for a fee of $50,000.00. In his initial consultation with Hansen, appellant told Hansen that his defense to the charges was that the money he withdrew from MMD-2 was his personal money. He described to Hansen the large amount of preparation he considered to be necessary for his defense, including an audit of MMD-2. Hansen assured appellant that he would do a thorough job and, specifically, that he would identify and interrogate all witnesses, thoroughly review all bank

accounts involved, travel to California to prepare appellant and his wife for their trial testimony, hire paralegals to prepare witnesses and exhibits, thoroughly research case law, and perform all other necessary efforts to properly prepare the case for trial.

On May 8, 1985, a preliminary hearing was held at which count 5 of the information was dismissed. Appellant was bound over for trial on the remaining four counts of second degree felony theft. Hansen called no witnesses at this hearing.

On June 6, 1985, appellant was arraigned. During the next two years, four trial dates were set and vacated. On numerous occasions, appellant and his wife unsuccessfully attempted to contact Hansen by telephone and letter regarding the case. However, Hansen did not respond to either written correspondence or telephone calls.

On March 16, 1987, Hansen prepared and served a demand for discovery upon the prosecutor. In this demand, he requested "an itemization of all physical evidence, including a list of all exhibits the prosecution intends to introduce at the time of trial." Hansen also prepared and served upon Sandy State Bank a subpoena requesting production of designated MMD–2 records. The bank did not deliver the records, however, because Hansen failed to pay the bank's requested copying charges.

On March 31, 1987, Hansen filed a motion for continuance of the trial scheduled for April 7. At that time, he had not obtained the MMD–2 records.

Pretrial preparation for appellant's defense was primarily undertaken by Hansen's paralegal. All appellant's contacts with Hansen during this time were through this paralegal or Hansen's secretary, both of whom were repeatedly told by appellant that the MMD–2 records would be critical to his defense because it was these records which contained the requisite exculpatory evidence. The paralegal assured appellant that Hansen would obtain the MMD–2 records.

Several weeks before trial, the paralegal attempted to collect the previously subpoenaed copies of the bank records. Because Hansen had previously not paid for the copies, however, they had become lost, and the paralegal had to reorder them. These records were finally picked up two days prior to trial.

When finally obtained, the subpoenaed records included only the MMD–2 deposit records for March, April, May and June of 1982. Hansen had not requested monthly statements, checks, disbursements, or credit and debit memos for any of these months, nor records for the months of July and August 1982, during which the events leading to count 4 of the information allegedly occurred.

Prior to trial, the prosecutor twice offered to allow Hansen to examine the state's evidence and to have an investigator familiar with the case explain it to him. Hansen did not take advantage of these offers.

Five weeks prior to trial, the paralegal attempted to assist Hansen in pre-trial preparation. However, Hansen was out of the office for long periods of time during this five week period and, ultimately, did not begin to review the file until two days before the trial began. Consequently, Hansen first contacted witness Gary Carlson two days before trial and witness James McIntyre the day before trial.

On the evening before trial, Hansen finally met with appellant and his wife. At that time, appellant observed that Hansen had only obtained MMD–2 deposit records for the four month period. When he asked where the rest of the account records were, Hansen replied, "That's all we need. They don't have a case." Appellant also asked Hansen why he had not secured the attendance of Blake Hammond, a former Alta vice president who had relocated to Phoenix, Arizona. Hansen admitted he had not subpoenaed Hammond, but told appellant that he thought that they "did not need Hammond." Hansen further failed to inform appellant's wife that she would be a witness at trial, even though, as escrow department manager at Alta in 1982, she had been in charge of some of the deposits made into MMD–2. He also failed to re-

view the deposit records with her or to prepare her to testify at trial.

The trial lasted from July 7 to 11, 1987. In Hansen's opening statement, he stated that he would show that appellant had "a great deal of" personal money in MMD–2, sufficient to cover the withdrawals that were the bases of the charges in the information, and that appellant's wife would "go through everything" to clarify the deposits of personal money.

Hansen called James A. McIntyre as a defense witness. Through McIntyre's testimony, he attempted to establish that appellant had made several deposits of personal funds into MMD–2. However, Hansen did not provide McIntyre with any documentary evidence to substantiate his testimony or to refresh his recollection. Consequently, McIntyre was unable to recall several of the transactions, and could not recollect, other than in general terms, the dates and exact amounts involved in other transactions. On cross-examination, McIntyre admitted he really did not know, but only assumed, that funds which appellant deposited in MMD–2 were his personal funds.

Hansen then called appellant's wife as a witness and attempted to have her verify appellant's deposits of personal funds into MMD–2 during 1982 from memory, without referring to specific records. She testified that appellant had made two $100,000.00 deposits; had taken out a personal loan for $17,082.00 to purchase a boat, the proceeds of which he had deposited in MMD–2; and had made deposits of $15,000.00, $19,-896.53, and a large number of $50.00 deposits which allegedly were agency fees due personally to appellant. Finally, she alluded to a personal deposit by appellant of about $8,000.00.

On cross-examination, however, the prosecutor pointed out that appellant's wife was testifying from memory in spite of having had many years to locate the deposit records about which she had testified, and confronted her with records showing: (1) that there were no $100,000.00 deposits; (2) an unexplained $17,082.00 withdrawal occurred two days after a $17,082.00 deposit was made; and (3) that the $15,000.00 and $19,869.73 deposits she had identified were immediately withdrawn from MMD–2 and, thus, were not available to cover the charged withdrawals. Hansen objected to this line of questioning on the grounds that he had not previously seen or been given an opportunity to examine the documents. The prosecutor responded that he had twice offered Hansen the opportunity to examine all of the state's evidence, but Hansen had failed to do so.

The court recessed for the evening and instructed Hansen and the prosecutor to go over the bank records that the prosecutor had intended to use to cross-examine appellant's wife.

The following day, on further cross-examination, the prosecutor established that appellant's wife withdrew $15,000.00 on the same day that it was deposited into MMD–2. Because she had not reviewed any of the documents, appellant's wife was surprised by this information. On further cross-examination, the prosecutor was able to show that another $19,896.73 deposit of appellant's personal funds was also withdrawn on the same day it was deposited. The prosecutor, likewise, established that many of the $50.00 agent fees that appellant claimed were his personal funds were withdrawn from MMD–2 and paid into another Alta account.

Hansen then called appellant as a witness and attempted to show that appellant had placed personal funds in MMD–2 at various times. However, except for small deposits from his personal account, appellant was only able to testify from memory because no documents were provided to establish exact deposit amounts.

The prosecution's evidence further showed that MMD–2 was consistently overdrawn; that during May, June, and August of 1982, appellant's personal bank account was also overdrawn; and that funds were occasionally transferred to it from MMD–2.

In June 1982, appellant had hired an accountant, Roger Piburn, who allegedly audited MMD–2 in November 1982. His testimony concerning three disbursements without corresponding deposits, one made on

May 19, 1982 for $20,000.00, one on June 11, 1982 for $16,800.00, and one on August 13, 1982 for $20,000.00, was extremely damaging to appellant.

The jury returned guilty verdicts on all four felony theft counts. Appellant was sentenced and committed to prison on October 23, 1987. He immediately filed a motion for a new trial, which was denied.

Appellant claims several errors on appeal: (1) he was denied effective assistance of counsel; (2) the trial court committed reversible error by admitting into evidence, without a cautionary instruction, a civil statute forbidding acts which appellant was not charged with violating; (3) two of the jury instructions were so misleading and confusing as to constitute prejudicial error; and (4) the trial court erred in failing to instruct the jury regarding specific intent.

Appellant argues that, because of ineffective assistance of counsel, he was deprived of a fair trial and, thus, that his rights under the sixth and fourteenth amendments of the United States Constitution were violated. Because we agree with appellant and find that he was deprived of a fair trial because of ineffective assistance of counsel, we do not reach the other issues.

The Utah Supreme Court, following constitutional mandates, recognizes the right to effective assistance of counsel. For example, in *State v. McNicol,* 554 P.2d 203, 204 (Utah 1976), the court stated that:

> the right of the accused to have counsel is not satisfied by a sham or pretense of an appearance in the record by an attorney who manifests no real concern about the interests of the accused. He is entitled to the assistance of a competent member of the Bar, who shows a willingnesss to identify himself with the interests of the accused and present such defenses as are available under the law and consistent with the ethics of the profession.

In a recent decision, *State v. Verde,* 770 P.2d 116 (1989), the Utah Supreme Court reaffirmed its commitment to the standard for effective assistance of counsel established in *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed. 2d 674 (1984), *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984): "a defendant who raises a claim of ineffective assistance of counsel must show both that his or her counsel rendered a deficient performance in some demonstrable manner and 'that a reasonable probability exists that except for ineffective counsel, the result would have been different.'" *State v. Verde,* 770 P.2d at 116, 118 (citing *State v. Lovell,* 758 P.2d 909, 913 (Utah 1988)). A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

To determine if the trial court correctly applied this standard, a reviewing court

> may engage in its own independent review of the district court's conclusion, because the issue of ineffective assistance of counsel presents a mixed question of law and fact. If a state court has rendered specific predicate factual findings, those findings should be presumed correct unless conditions exist which cast those findings into doubt. The district court's findings of fact, however, are reviewable under the clearly erroneous standard.

*Laws v. Armontrout,* 863 F.2d 1377, 1381 (8th Cir.1988) (citations omitted). Therefore, judicial scrutiny of counsel's performance must be highly deferential and recognize the importance of sound trial strategy. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Additionally, appellant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.

 Aside from the trial court's statement in its memorandum decision that "the probability is high that the jury did not find them [appellant and his wife] to be credible," we found no factual findings supporting its conclusion that "the defendant has

failed to show a reasonable likelihood of a different result absent counsel's deficient conduct." Without such factual findings, "we must reverse unless the evidence is clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Johnson v. Johnson,* 771 P.2d 696, 700 (Ct.App.1989).

The evidence in the record is anything but clear and uncontroverted in support of the trial court's judgment.

Under *Strickland,*

[t]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options.

. . . .

These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case.... [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.*

*Strickland,* 466 U.S. at 680, 690–91, 104 S.Ct. at 2060, 2066 (emphasis added).

Hansen's professed strategy, as stated in his opening argument, was to show that MMD–2 was a money-making, interest-bearing account rather than an escrow account, and that it contained not only customers' money but substantial amounts of appellant's personal funds. To carry out this strategy, Hansen would have had to be totally familiar with MMD–2. However, a mere two days before trial, he subpoenaed only the deposit records for March, April, May and June of 1982, failing to request any other records, including not only the remainder of the MMD–2 records for these four months and those for July and Au-

gust, but records for the several other interrelated accounts belonging to Alta. Further, Hansen made no effort to investigate the undetermined yet sizable amount of agent fees deposited into MMD–2, which appellant considered to be his personal funds. Hansen made no attempt to explain the overdrawn condition of MMD–2, or to account for the transfer of funds from MMD–2 to appellant's personal bank account. While there may have been no suitable explanation for these conditions, Hansen made no attempt to investigate them, or to even review the records concerning these transfers that were in the prosecutor's possession.

Hansen also failed to contact a witness, Blake Hammond, whose testimony appellant considered to be critical in rebutting Piburn's testimony. Thus, Hansen could not know whether Hammond's testimony would have been helpful or not. The following excerpt from *Jennings v. State,* 744 P.2d 212, 214 (Okla.Crim.App.1987), is most apropos:

When counsel knows of the existence of a person or persons who possess information relevant to his client's defense, and he fails to use due diligence to investigate that evidence, such a lack of industry cannot be justified as "strategic error." The American Bar Association Standards for Criminal Justice, Defense Function 4–4.1, maintain that: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."

As in *Jennings,* we find that "[t]his blatant lack of investigation indicates a severe deficiency in the performance of trial counsel." *Id.*

Hansen's most serious omission, however, was his failure to prepare appellant and his wife for their trial testimony. Disregarding appellant's repeated instructions and requests, Hansen not only failed to obtain critical documents, but did not review the documents in his possession with either appellant or his wife prior to trial.

Even more surprising, he did not inform appellant's wife prior to trial that she would be called as a witness, despite her critical role as manager of Alta's escrow department during 1982 and his strategic reliance upon her testimony. As a consequence, appellant and his wife were forced to attempt to recall five year old financial transactions while on the witness stand. Even the prosecutor, obviously aware of this serious omission, commented that appellant and his wife had two years to prepare for trial and review the records, but had failed to do so. As a result, appellant and his wife appeared confused and lacked credibility. Further, McIntyre, another defense witness, also testified without any preliminary review.

There were other instances of dereliction but we are satisfied that further enumeration is not necessary.

We conclude that Hansen's failure to prepare and investigate was so serious and his performance so deficient that he was not functioning as the "counsel" guaranteed by the sixth amendment. Appellant has identified acts or omissions by counsel that "fall outside the wide range of professionally competent assistance." *State v. Frame*, 723 P.2d 401, 405 (Utah 1986). Consequently, we find that that appellant has successfully proven the first prong of the *Strickland–Verde* test, that "counsel rendered a deficient performance in some demonstrable manner." *State v. Verde*, 770 P.2d at 118; *see Strickland*, 466 U.S. at 693–94, 104 S.Ct. at 2068.

We now turn to the second prong of the *Strickland–Verde* test, which requires appellant to show that "a reasonable probability exists that the result would have been different except for ineffective counsel." *State v. Verde*, 770 P.2d at 118; *see Strickland*, 466 U.S. at 694; 104 S.Ct. at 2068.

After being sentenced, appellant retained new counsel, who immediately hired a CPA to perform a review of MMD–2. The CPA examined the records of MMD–2 and other Alta accounts possessed by the county attorney, by Main Hurdman, a CPA firm that had done a detailed analysis of Alta accounts, by Larson and Crockett, who apparently represented an underwriter concerned with Alta, and by Sandy State Bank. Because of time limitations, the CPA was unable to perform a complete audit of these accounts prior to the hearing on appellant's motion for a new trial. However, he found records during his review indicating that on June 28, 1982, appellant deposited $24,622.50 from his personal funds into MMD–2, and that those funds were still in MMD–2 on August 13, 1982, when appellant withdrew $16,500.00, the basis for count 4 of the information. Further, the review indicated that $50,000.00 of appellant's personal funds, which were supposed to have been deposited into MMD–2, were, in fact, inadvertently deposited by McIntyre into a Sandy State Bank account entitled "Alta Title Contract Servicing Account" on August 5, 1982. There was no evidence that this deposit was ever withdrawn prior to the time Alta ceased doing business in March 1983. The review also confirmed that $8,865.43 of appellant's personal funds were deposited into MMD–2 on September 28, 1982, and that over $500,-000.00 due to appellant upon the sale of Alta's building was available to appellant in 1982, which funds were placed into bank accounts managed by Alta. In summary, the CPA found that a determination of whether funds were available to cover the withdrawals would require a review of all of Alta's accounts, which had never been done. He also found that, prior to the date of the last count on the information, by which time appellant had allegedly stolen $57,300.00, $76,601.23 of personal funds had been deposited by or on behalf of appellant into MMD–2, and that other personal funds belonging to appellant were deposited into MMD–2 after August 13, 1982.

At the hearing on his motion for a new trial, appellant not only introduced the CPA's reports, but submitted affidavits containing information that should have been known to Hansen had he conducted a suitable investigation prior to trial. The affidavit proferred the following testimony from the following persons: (1) Gary Carlson, former vice president of Alta, stated that tens of thousands of dollars due personally to appellant from Bajan, Inc. were

deposited in MMD–2, and that he could rebut Piburn's testimony by showing that Piburn had not performed an audit on MMD–2. (2) Blake Hammond, a former Alta employee and signator on MMD–2, was willing to testify to the same matters as Carlson. (3) James McIntyre, former counsel to Alta and Crestani, could testify that the $50,000.00 deposit referred to in the CPA's report belonged to appellant personally, that MMD–2 was not an escrow account, and that he had offered Hansen his and Carlson's assistance in auditing MMD–2 over a year prior to trial, but was not contacted by Hansen until the day before trial. (4) Shirlene Ivory, Hansen's paralegal, would testify that appellant had expressed serious concern to her that Hansen was not ready for trial and that MMD–2 was extremely important to his defense and should be reviewed; that she was appellant's contact person in Hansen's office, and had told him that Hansen was busy with other cases so would contact him when he could; that appellant had expressed concern that he was unable to talk with Hansen; that the prosecutor had made his records available for inspection but she was never instructed to pick them up; that the prosecutor proffered a plea bargain to permit Crestani to plead to one felony count and dismiss the other charges, which she communicated to Hansen; that the documents subpoenaed from the bank were picked up two days before trial; and that she did not observe Hansen review the file until the day before trial.

The trial court found that defense counsel had relied upon the testimony of appellant and his wife, and that the probability was high that the jury did not find them to be credible, stating that "if they were truthful in their testimony at the time of trial, preparation or lack thereof should not have changed their truthful testimony." Although truthful testimony is generally based upon accurate information, testimony may be truthful yet inaccurate if memory fails and nothing has been done to refresh or stimulate that memory. This is especially true when factual information involves detailed accounting of dollar amounts, sources of deposits and withdrawals, dates, multiple bank accounts, and events that transpired five years prior to trial. It appears obvious that this is what happened, based upon the affidavits of appellant, Mrs. Crestani, and the other persons who were, or should have been, called as witnesses. As such, we find that conditions exist which cast serious doubt upon the trial court's findings, see *Armontrout*, 863 F.2d at 1381, and, consequently, that "a reasonable probability exists that except for ineffective counsel, the result would have been different." Therefore, we find that appellant has sustained his burden on the second prong of the *Strickland–Verde* test. Thus, we have a "definite and firm conviction that a mistake was made" in refusing to grant appellant a new trial. *See State v. Walker*, 743 P.2d 191, 193 (Utah 1987).

In its memorandum decision, the trial court stated that "[t]here is no question that preparation for a trial is important but the final test is counsel's conduct in the courtroom." We think the court's emphasis is misplaced. Certainly, there can be no appropriate performance in the courtroom without adequate preparation, and without such preparation, representation is nothing but a sham and a pretense. As stated in *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." We, therefore, reverse and remand for a new trial.

BILLINGS and DAVIDSON, JJ., concur.