2023 UT App 28

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BECKY DEON PULLMAN,
Appellant.

Opinion
No. 20200279-CA
Filed March 23, 2023

Sixth District Court, Manti Department
The Honorable Wallace A. Lee
No. 181600120

Emily Adams and Freyja Johnson, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in
which JUDGE MICHELE M. CHRISTIANSEN FORSTER and
JUSTICE JILL M. POHLMAN concurred.[1]

MORTENSEN, Judge:

¶1 Becky Deon Pullman contends that her father (Father) asked her to repossess a car he had sold to an acquaintance (Acquaintance). After Pullman retrieved the car, Acquaintance reported it stolen, and Pullman was charged with theft. At trial, Father denied asking Pullman to repossess the car. Pullman's trial

---

1. Justice Jill M. Pohlman began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

lawyer (Counsel) failed to call key witnesses and enter the car's title history into evidence. Because we agree with Pullman that Counsel rendered deficient performance that prejudiced her, we reverse her convictions and remand the matter for a new trial.

BACKGROUND

*The Alleged Crime*

¶2      After Acquaintance's car broke down, Pullman suggested to Father that he allow Acquaintance to borrow his car, which he did. Soon after, Father and Acquaintance reached an agreement in February or March 2018 for Acquaintance to purchase the car. According to that agreement, Acquaintance would buy the car for $2,700 through monthly payments to Father of $200 until Acquaintance paid the total amount. But the only payment Acquaintance made was a $1,200 "lump sum payment," and accordingly, the title remained in Father's name.

¶3      Between April and June 2018, Acquaintance asserts that Pullman contacted her three to five times, claimed that Pullman had been placed "over her dad's affairs," and that Acquaintance should "put the remainder of what [Acquaintance] owed on the car into [Pullman's] account." Pullman also informed Acquaintance that if she did not produce the money, "the car would be gone." Acquaintance testified that she refused to follow this demand, at which point Pullman stopped contacting her. But according to Pullman, Father had repeatedly asked her to "pick up the car for him" because Acquaintance "was not making payments" and he "couldn't [go] and get the car." Pullman testified that she repeatedly called Acquaintance, but to no avail. Eventually, Pullman determined it was time to pick up the car.

¶4      Pullman, who had obtained the keys, title, and registration, first called the police to seek "assistance in the repossession of a vehicle" but was unable to speak with an officer at that time.

Instead of waiting until after she had spoken with an officer, Pullman and a friend located the car at Acquaintance's boyfriend's work during the first week of June 2018. The friend took the keys to the car and drove it to the home of his niece. Pullman claimed that she had no interest in the car and, accordingly, that she did not keep track of where it was taken at that time. Pullman then called the police and "stated that they had been able to take care of everything, and they didn't need . . . assistance anymore."

¶5      When Acquaintance discovered that the car was missing—along with the personal property inside it (some stereo equipment, an iPod, a sleeping bag, some jewelry, and some clothing)—she contacted the police. The police responded by contacting Father, who reported that he was not intent on repossessing the car and that he never authorized Pullman to repossess it. The police then turned their attention to Pullman. When the police called, they began by asking about the car she had requested help repossessing. Pullman responded, "Oh, yes, that car. What about the car?" The police then asked where it was, to which Pullman responded, "I have no idea what you're talking about. I don't want to talk to you," before hanging up. Although the police did not reach out to Pullman again, she contacted them a few hours later. She explained that (1) she faced financial problems; (2) she was upset that Father sold the car to Acquaintance because the "car was supposed to be her car"; (3) Father had instructed her to get the car; (4) Father was "mentally incapacitated," could not "remember things," did "not speak well," had "severe memory deficiencies," and "simply didn't remember that he told her to go get the car"; and (5) she did not know where the car was.

¶6      The State charged Pullman with two counts of theft—one for the car and one for the personal property inside the car. *See* Utah Code § 76-6-404 ("A person commits theft if he obtains or

exercises unauthorized control over the property of another with a purpose to deprive him thereof.").

*The Trial*

¶7 At trial, Father testified that Pullman had no ownership interest in the car, that he never gave her authority over his financial affairs, that he never gave her permission to contact Acquaintance to request payments for the car be made directly to her, and that he never gave her permission to repossess the car. Pullman, on the other hand, maintained that Father asked her many times to repossess the car and that she did not return it to him because he did not want it. She also testified that when she looked in the car at the time she took it, "[t]here was nothing in there."

¶8 The jury found Pullman guilty of both counts of theft, and at sentencing, based on the State's representation of what it "believe[d]" the value of the car to be, the court ordered Pullman to pay a restitution" to Acquaintance.

*Rule 23B Remand*

¶9 Claiming on appeal that she had received ineffective assistance of counsel, Pullman filed a motion under rule 23B of the Utah Rules of Appellate Procedure seeking a remand to develop evidence on whether Counsel was ineffective. *See* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). Specifically, Pullman asserted that Counsel was ineffective for not investigating evidence that allegedly showed Father had asked her to repossess the car and that Father had later sold the repossessed car to another individual. This court granted the motion. On remand, the district court heard testimony from a person Father allegedly spoke to about repossessing the car

(Witness), the car's post-repossession buyer (Buyer), and Buyer's wife (Wife). The title history was also admitted as an exhibit.

*Findings on Remand*

¶10 The court entered the following findings about Witness's testimony: (1) she worked at a gas station where Father would stop in the mornings to have coffee with friends; (2) Father talked with her about the car; (3) Father told her that "he had sold the car to a girl who had stopped making payments" and that he had asked Pullman to repossess the car after another person declined to do so; (4) Father said he "wished he had known [Witness] before, because he would have asked her to pick up the car for him"; (5) Pullman "was at the gas station during the conversations where [Father] talked to [Witness] about the car"; and (6) Witness was not contacted by Counsel or an investigator before trial. The district court also entered a finding that Witness had pled guilty to taking "the identity of another" during a traffic stop and was currently incarcerated for an assault conviction.

¶11 Regarding Buyer's testimony, the district court entered the following findings of fact: (1) Pullman had asked permission to park the car on Buyer's property, where it sat "for some time"; (2) Buyer asked Wife "to talk with" Pullman about the car, and Pullman "said she would have to ask" Father about the car; (3) Buyer obtained the car's VIN and went to the bank to get pre-approved for a loan; (4) Father picked up Buyer and drove him to the bank, where Buyer finalized a loan and Father received a check, which he cashed at the bank; (5) Buyer identified his signature as the buyer and Father's name as the seller on the title of the car, which indicated the date of purchase as July 7 or July 11, 2018; and (6) Buyer was not contacted by Counsel or an investigator before trial.

¶12 The court entered the following findings about Wife's testimony: (1) Pullman came to her house and asked to park a car that "she had just picked up . . . from someone . . . who had not

paid" for it; (2) Pullman had the keys and title, both of which she left with Wife; (3) Buyer had asked Wife to find out what Pullman "was going to do with the [c]ar"; (4) Pullman told Wife that "she needed to ask her dad about selling the [c]ar," and that Father told Pullman he was willing to sell it; (5) Wife communicated directly with Father about the car; (6) Father picked up Buyer to go to the bank after a loan for the car was pre-approved; (7) after Buyer and Wife became interested in buying the car, Wife looked inside of it and did not see an iPod, stereo equipment, or jewelry, but she did see a dirty sleeping bag and a sweatshirt; and (8) Wife was not contacted by Counsel or an investigator before trial.

¶13    The title, by which ownership was transferred, shows that Father, as the car's registered owner, assigned the title to Buyer in July 2018 for $4,000. Other records from the Utah Division of Motor Vehicles, admitted by the court on remand, indicate that (1) Father was issued a title to the car on January 16, 2018, which he canceled on July 26, 2018; (2) Buyer was issued a title (which was encumbered by a lien to a bank in Beaver, Utah) to the car on August 14, 2018; and (3) Buyer was issued a lien-free title on September 23, 2020.

ISSUE AND STANDARD OF REVIEW

¶14    Pullman contends that she received constitutionally ineffective assistance when Counsel did not (1) call Witness to testify, (2) call Buyer and Wife as witnesses, and (3) present evidence of the car's title history showing that Father had sold the car to Buyer after Pullman repossessed it. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up). And "in ruling on an ineffective assistance of counsel claim following a rule 23B

hearing, we defer to the trial court's findings of fact." *State v. King*, 2017 UT App 43, ¶ 13, 392 P.3d 997 (cleaned up).[2]

ANALYSIS

¶15 Pullman claims that Counsel was ineffective in not calling several witnesses and for not moving to admit the car's title history as evidence. To establish ineffective assistance of counsel, Pullman "must show that (1) [Counsel's] performance was deficient in that it fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense." *See State v. Wright*, 2021 UT App 7, ¶ 52, 481 P.3d 479 (cleaned up), *cert. denied*, 496 P.3d 718 (Utah 2021).

I. Counsel's Performance Was Deficient

¶16 The performance prong "entails certain basic duties" of defense counsel. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Among these is an "overarching duty to advocate the defendant's cause" by "bring[ing] to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* To this end, the "Sixth Amendment . . . relies . . . on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the [envisioned] role in the adversary process." *Id.* Thus, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*

---

2. On appeal, Pullman raises other ineffective assistance of counsel claims based on various aspects of the proceedings below. Pullman also contends that the district court improperly excluded her testimony about certain out-of-court statements Father made. Because we reverse Pullman's convictions and remand for a new trial based on the issues raised in her rule 23B motion, it is unnecessary for us to address these additional claims.

¶17 "[P]revailing professional norms," *see id.*, require defense counsel to conduct a reasonable investigation, *see State v. Crestani*, 771 P.2d 1085 (Utah Ct. App. 1989). We have observed that "the American Bar Association Standards for Criminal Justice" maintain that a lawyer has a duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Crestani*, 771 P.2d at 1090 (cleaned up); *see also* ABA, *Criminal Justice Standards for the Defense Function*, Standard 4-4.1(a)–(c) (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards /DefenseFunctionFourthEdition/ [https://perma.cc/RUK8-TABY]. "An attorney has a duty to conduct a reasonable investigation into the facts of [a] client's case and to make reasonable decisions regarding the proper scope of that investigation." *Honie v. State*, 2014 UT 19, ¶ 36, 342 P.3d 182. "In determining whether counsel's investigation was reasonable, we consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Taylor v. State*, 2007 UT 12, ¶ 48, 156 P.3d 739 (cleaned up). And "[t]hough trial counsel is not required to present all evidence uncovered during the investigation of a client's case, an attorney is required to perform any investigation competently and thoroughly." *Honie*, 2014 UT 19, ¶ 36. But "if counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the wide range of reasonable professional assistance." *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) (cleaned up).

¶18 Here, Pullman was charged with theft for "obtain[ing] or exercis[ing] unauthorized control over the property of another with a purpose to deprive" the rightful owner of that property. *See* Utah Code § 76-6-404. Thus, crucial to Pullman's defense was her claim that Father had authorized her to retrieve the car on his behalf. As the State itself acknowledged in closing, "[t]he biggest

[issue] in the room" was "whether [Pullman] believed she had authority to repossess this car, go take this car, or she didn't." The State asserted, Father "never told her to act on his behalf. . . . He was very clear that at no point did he ever tell her to go repossess this car."

¶19　Counsel was aware of Witness and even mentioned her during the trial, but Counsel did not contact Witness to inquire about her knowledge of Father's request that Pullman repossess the car. Had Counsel contacted Witness, he would have learned that she could corroborate Pullman's account and rebut Father's testimony. Given the significance of this testimony to Pullman's defense, Counsel acted unreasonably by not investigating Witness and calling her at trial.

¶20　Similarly, Counsel acted deficiently by not contacting Buyer to interview him about the circumstances surrounding his purchase of the car from Father. Counsel was aware of Buyer, and had Counsel interviewed him, Counsel would have learned the identity of Wife, who could also testify that Pullman told her she needed to ask Father about his interest in selling the car and that Father ultimately agreed to sell the car to Buyer.

¶21　In much the same way, Counsel rendered deficient performance in not investigating the car's title history. Prior to trial, Counsel knew that Father had given the title of the car to Buyer when Father sold the car to him. It was unreasonable for Counsel, upon learning of the sale to Buyer, not to obtain a copy of the title. After all, the title would have supported Pullman's assertion—with official government documents no less—that she acted at Father's behest to retrieve the car by showing that Father was the one who benefitted from Pullman repossessing the car. Moreover, the title was readily available to Counsel via a request to the Utah Department of Motor Vehicles. Thus, Counsel had a duty to investigate this evidence, not only because he was aware

of it, but also because it supported Pullman's assertion that she was authorized by Father to repossess the car.

¶22    Given the significance of these witnesses and the car's title history and the availability of both to Counsel, Counsel's failure to investigate or present either of them constituted deficient performance. *See Crestani*, 771 P.2d at 1090.

## II. Counsel's Deficient Performance Prejudiced Pullman

¶23    "Counsel's performance is prejudicial if the defendant can demonstrate that there is a reasonable probability that the outcome of his or her case would have been different absent counsel's error. Accordingly, the defendant must do more than simply show that the errors had some conceivable effect on the outcome of the proceeding." *State v. Wright*, 2021 UT App 7, ¶ 54, 481 P.3d 479 (cleaned up), *cert. denied*, 496 P.3d 718 (Utah 2021).

¶24    Of particular importance in the prejudice analysis here is that Pullman claims that Father gave her permission to repossess the car. In fact, she testified that Father asked her to "pick up the car for him" because Acquaintance "was not making payments" and he "couldn't [go] and get the car." In contrast, Father testified at trial that he never gave her permission to repossess the car. Thus, a key issue at trial was "largely a credibility contest" between Pullman and Father. *See State v. J.A.L.*, 2011 UT 27, ¶ 41, 262 P.3d 1. Pullman "presented her version of the events," and Father "offered a different version." *See id.* In this context, testimony from additional witnesses and the title history "would have affected the entire evidentiary picture" by tilting it in favor of Pullman's version over Father's. *See id.*; *see also State v. High*, 2012 UT App 180, ¶ 50, 282 P.3d 1046 (stating that where conviction is largely based on conflicting testimony, "witness credibility [becomes] the cornerstone of the case").

¶25    The missing testimony almost entirely favors Pullman's version of events about the car. Witness would have testified that

Father had asked Pullman and others to repossess the car for him. Buyer would have testified that Father sold the car to him even after it had been reported stolen. And Wife would have testified that Father communicated with her directly about buying the car. Thus, all three witnesses would have offered testimony supporting Pullman's assertion that it was Father who authorized the repossession of the car. Not only would Witness have given specific testimony in this respect, but Buyer's and Wife's testimonies would have lent support to Pullman's account by showing that Father knew about the repossession and ultimately benefitted from it. And the title history also supports Pullman's account, albeit indirectly, by showing that Father sold the car to Buyer after it was reported stolen. The missing witness testimony and title history suggest Father authorized the repossession, knew of the repossession, and was the sole beneficiary of the repossession, thus making Father's trial testimony that he did not ask Pullman to repossess the car suspect. In light of the additional evidence, it is reasonably likely that the jury would have discounted Father's testimony and acquitted Pullman of theft of the car.

¶26 Additionally, it is reasonably likely that the jury would have acquitted Pullman for theft of the items in the car had it heard the testimonies of Witness, Wife, and Buyer. These testimonies would have supported Pullman's overall account and increased her credibility. Although the witnesses could not provide any relevant information about whether Pullman took personal items from the car when she dropped it off,[3] we cannot overlook that Pullman's overall credibility would have been

---

3. Wife could testify that she found no items in the car when she looked inside of it after she and Buyer became interested in purchasing it, but there is no suggestion that she saw the inside of the car when it was taken by Pullman or that she observed Pullman's actions (namely, whether she took any items from the car) when Pullman dropped it off.

strengthened by the corroboration these witnesses provided regarding her repossession of the car. That is significant because the jury's assessment of the charge for theft of personal items depended entirely on its assessment of Pullman's and Acquaintance's respective credibility. Father's testimony, standing alone, may have made the jury doubt Pullman's testimony regarding the taking of the car and, by extension, the alleged theft of the missing items. But if the jury believed Pullman about the repossession after hearing the testimony of Witness, Buyer, and Wife, it more likely would have believed her testimony about the personal items. Thus, it is reasonably likely that the jury would have acquitted Pullman of theft of the personal items if the witnesses had testified.

¶27     In sum, we have no trouble concluding that Pullman was prejudiced by Counsel's failure to introduce the missing evidence. With the witness testimonies and title history in hand, there is a reasonable likelihood that the jury would have concluded that the State had not met its burden of showing that Pullman exercised "unauthorized control" over another's property. *See* Utah Code § 76-6-404.

CONCLUSION

¶28     Having concluded that Pullman received ineffective assistance when Counsel did not call key witnesses and failed to investigate the car's title history, we reverse Pullman's convictions and remand the matter for a new trial.

───────────