2011 UT 27

**STATE of Utah, Plaintiff and Appellee,**

v.

**Jeffery Anton LENKART, Defendant and Appellant.**

No. 20090369.

Supreme Court of Utah.

May 17, 2011.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Ronald J. Yengich, Elizabeth Hunt, Salt Lake City, for defendant.

## AMENDED OPINION *

Justice NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 Jeffery Lenkart was charged with rape, forcible sodomy, and two counts of forcible sexual abuse. A jury convicted him on all counts, and he was sentenced to concurrent prison terms. Following his sentencing hearing, Mr. Lenkart moved to arrest judgment and filed a motion for a new trial, which the trial court denied. On appeal, Mr. Lenkart argues that the trial court erred when it denied his motion for a new trial. Mr. Lenkart first argues that his trial counsel was

ineffective. Mr. Lenkart also claims that the trial court committed several other errors that require reversal of his conviction. Because we conclude that Mr. Lenkart's trial counsel was ineffective when he failed to investigate and present important exculpatory physical evidence at trial, we reverse Mr. Lenkart's conviction, remand for a new trial, and decline to reach the merits of Mr. Lenkart's other claims.

## BACKGROUND

¶ 2 On the evening of July 22, 2007, Jeffery Lenkart hosted a party at his apartment. K.H. and her boyfriend, Brian Calitri, were first to arrive, followed by other guests. Later, K.H.'s friend, Shaunessy Rogers, also joined the group. The guests drank and mingled together. K.H. drank two large vodka-gatorades. Mr. Lenkart drank several glasses of wine.

¶ 3 Later that night, the group left Mr. Lenkart's apartment to attend a "Spazmatics" concert at a bar called Liquid Joes. The group continued to drink and dance until the bar closed at 1 a.m.

¶ 4 Around 1:30 a.m., Mr. Lenkart took a cab back to his apartment. Ms. Rogers, K.H., and her boyfriend also returned to Mr. Lenkart's apartment. After they arrived, Mr. Lenkart and K.H. walked Ms. Rogers back to her nearby apartment so she would not have to walk home alone. Ms. Rogers testified that on the way there, the three engaged in light-hearted conversation and that no one seemed overly intoxicated. After Ms. Rogers went inside her apartment, Mr. Lenkart and K.H. returned to Mr. Lenkart's apartment. K.H. fell asleep on Mr. Lenkart's bed. K.H.'s boyfriend fell asleep next to her and, as a result, Mr. Lenkart decided to sleep on his living room futon. At some point during the night, K.H. woke up to use the bathroom. It is at this point that the parties' descriptions of the subsequent events diverge.

¶ 5 K.H. testified that she woke up on the futon to someone pulling out her bra inserts and sucking on her breasts. She did not know where she was or who was touching

---

* We refer to the victim as K.H. throughout this opinion.

her, but she assumed it was her boyfriend. Without opening her eyes she said, "don't" and "pushed [the person's head away] and passed out." K.H. testified that she woke up a second time to find that her pants and underwear had been removed. She was on her back with her legs spread, and the person next to her "put his fingers and his mouth on [her] genitals." K.H. could not tell who the person was, but she did not recognize the person's breathing pattern. She was scared, told the person to stop, and unsuccessfully tried to push the person off of her. She then "passed out" again. K.H. testified that when she woke up the third time, someone was "thrusting" "inside of [her]." At this point, she realized that the person on top of her was Mr. Lenkart. She began to sob and said "no." But according to K.H., Mr. Lenkart did not stop. Eventually, Mr. Lenkart withdrew; K.H. was unsure whether he ejaculated. K.H. jumped off the futon, grabbed her clothes, and ran into the bathroom. K.H. put her clothes back on and ran into the bedroom to wake her boyfriend. Her boyfriend was very intoxicated and she had trouble waking him. K.H. shook him and whispered, "Brian wake up, wake up, [Mr. Lenkart] just raped me." Mr. Calitri eventually woke up. At first, he did not believe K.H. He told her that she was just having a bad dream and that she should try to go back to sleep. K.H. ran from the room and fled to Ms. Rogers' apartment. From there, she called the police. Mr. Calitri arrived shortly thereafter.

¶ 6 Mr. Lenkart's version of the events is quite different. Mr. Lenkart testified that he woke up to a noise in the middle of the night and saw K.H. walking out of the bathroom into the living room area where he was sleeping. According to Mr. Lenkart, K.H. made her way around his coffee table and curled up next to him on the futon. Mr. Lenkart put his hand on K.H.'s shoulder and she rolled over to her back. At this point, Mr. Lenkart put his hand on her stomach and then on her breast. Mr. Lenkart testified that K.H. "moaned in pleasure," which he interpreted as sexual arousal. At this point, Mr. Lenkart moved closer to K.H. and the couple began to passionately kiss. Mr. Lenkart then removed his shirt and lifted K.H.'s shirt to expose her breasts. K.H. moaned again in pleasure, so he helped her remove her pants. Mr. Lenkart licked the outside of her underwear. K.H. helped Mr. Lenkart remove her underwear, and she opened her legs, "giving [Mr. Lenkart] every indication that she was interested in having sex." The two began to have sexual intercourse. After several minutes, Mr. Lenkart testified that he heard a sniffling sound and realized that K.H. was no longer enjoying herself. Mr. Lenkart testified that he immediately withdrew and stopped without ejaculating. Without saying anything to Mr. Lenkart, K.H. started to put on her clothing and began to cry. She then ran into Mr. Lenkart's bedroom where her boyfriend was sleeping and eventually fled the house. Mr. Lenkart later learned that K.H. ran to Ms. Rogers' apartment to call the police.

¶ 7 A police officer arrived at Ms. Rogers' apartment at approximately 6 a.m. The police officer talked to Mr. Calitri and Ms. Rogers and then interviewed K.H. K.H. was then taken to LDS Hospital, where a Code R examination [1] was conducted.

¶ 8 The Code R nurse found a tear in K.H.'s vaginal skin and tenderness in her genitalia. During the exam, K.H. told the nurse that she had inserted a tampon sometime before the sexual encounter. The nurse used tweezers to find and remove it.

¶ 9 While K.H. was at the hospital, the responding officer went to Mr. Lenkart's house. Mr. Lenkart was asleep on his balcony. The officer woke Mr. Lenkart and told him that he was being arrested for raping K.H. Mr. Lenkart was angry. He told the officer, "This is bullshit. She raped me as much as I raped her." Later, Mr. Lenkart was formally charged with rape, forcible sodomy, and two counts of forcible sexual abuse.

¶ 10 Mr. Lenkart hired private counsel to defend him at trial. Mr. Lenkart asked his attorney about the physical evidence collect-

---

1. During a Code R examination, a nurse makes observations and collects physical evidence such as saliva, hair, fiber, or semen, which may later be introduced at trial or otherwise used by the parties as evidence in the case.

ed and whether the Code R kit could be analyzed. Mr. Lenkart wanted the physical evidence to be examined because he believed it would corroborate his version of the events. Despite Mr. Lenkart's request, the record contains nothing that would suggest that Mr. Lenkart's attorney sought to have the Code R kit analyzed or that he attempted to consult with any experts. The case went to trial. The defense did not call any medical experts to testify about the physical evidence.

¶ 11 Six witnesses testified at trial. The prosecution called K.H., her boyfriend, Ms. Rogers, the responding police officer, and the Code R nurse who examined K.H. at the hospital. The defense called only Mr. Lenkart.

¶ 12 K.H. testified first, followed by Mr. Calitri. Ms. Rogers was the prosecution's third witness. She was followed by the responding officer. This testimony recounted what K.H. had said about the evening's events. The nurse testified last, just before Mr. Lenkart. The nurse stated that in her opinion, K.H.'s injuries were consistent with forcible sexual conduct. The nurse also testified that K.H. told her she had inserted a tampon sometime earlier in the evening, but when she went to take it out the next morning, she could not find it. The nurse testified that she removed the tampon with tweezers. On cross-examination, the nurse acknowledged that although in her opinion K.H.'s injuries were caused by nonconsensual sexual conduct, it was possible that the injuries were consistent with consensual sexual conduct as well.

¶ 13 The jury convicted Mr. Lenkart of all charges. Mr. Lenkart was sentenced to five years to life for the rape and forcible sodomy charges, and one to fifteen years for each of the forcible sexual abuse charges. Mr. Lenkart's trial counsel then withdrew and Mr. Lenkart hired new counsel.

¶ 14 Following his sentencing hearing, Mr. Lenkart moved to arrest judgment and filed a motion for a new trial. Mr. Lenkart argued that a new trial was necessary because the verdict was not supported by the evidence and because his trial counsel was ineffective. Mr. Lenkart also argued that the trial court improperly admitted numerous hearsay statements, prior bad acts evidence, and evidence concerning the victim's chastity that violated the rape shield law.

¶ 15 In support of his motion for a new trial, Mr. Lenkart submitted an affidavit from Susan Bryner Brown, a reputable forensic nurse examiner [2] who analyzed the Code R kit post-trial. Ms. Bryner Brown's affidavit stated that in her opinion, the Code R evidence was more consistent with consensual rather than nonconsensual sexual conduct. She further stated that in her experience, many young women forget to remove tampons before sex and that many others intentionally leave tampons in place during sex to stop blood flow and to enhance the sexual experience. Finally, Ms. Bryner Brown noted that the Code R kit did not reveal any salivary amylase in K.H.'s swabs, "which would be [sic] likely be expected if oral sex had occurred during the time frame of the alleged assault."

¶ 16 The trial court denied Mr. Lenkart's motion. The trial court concluded that Mr. Lenkart's counsel's representation may have been deficient, but that even if it was, Mr. Lenkart failed to demonstrate that he was prejudiced by the deficiency because Ms. Bryner Brown's testimony did not "necessarily establish [Mr. Lenkart's] innocence." The trial court did not find any of Mr. Lenkart's other arguments persuasive.

¶ 17 Mr. Lenkart also moved the trial court to order the State to identify the victim's mental health providers and to issue subpoenas for her mental health records. But because the trial court denied Mr. Lenkart's motion for a new trial, it concluded

---

2. *See Houskeeper v. State*, 2008 UT 78, ¶ 44 n. 47, 197 P.3d 636 ("Susan Bryner Brown is a registered nurse who is credentialed to conduct sexual assault examinations. She has conducted and assisted in conducting over one thousand three hundred rape examinations. She is qualified to testify as a sexual assault expert in three Utah counties, helped develop the current Code–R rape examination kit for Utah, and assists in credentialing Utah nurses to perform Code–R examinations. She also has been trained by Dr. Laura Slaughter, who has published four studies on patterns of injuries related to consensual and nonconsensual sexual contact.").

that it was unnecessary to consider the merits of the mental health records motion.

¶ 18 Mr. Lenkart timely filed this direct appeal. We have jurisdiction under Utah Code section 78A–3–102(3)(i) (Supp.2010).

### STANDARD OF REVIEW

¶ 19 We need to address only the following two issues on appeal: (1) whether Mr. Lenkart's trial counsel was ineffective and (2) whether the trial court erred in denying Mr. Lenkart's motion for access to the victim's mental health records.

¶ 20 Typically, we review a denial of a motion for a new trial under an abuse of discretion standard.[3] However, when a defendant asserts a constitutional claim of ineffective assistance of trial counsel, a different standard of review applies.[4] An ineffective assistance of counsel claim is a mixed question of law and fact.[5] We review the trial court's application of the law to the facts under a correctness standard.[6] If there are factual findings to review, we will not set them aside unless they are clearly erroneous.[7]

¶ 21 Whether a trial court errs in denying a motion for access to a victim's mental health records is a question of privilege. "A [trial] court's decision regarding the existence of a privilege is a question of law ... and is reviewed for correctness."[8]

### ANALYSIS

¶ 22 On appeal, Mr. Lenkart advances several arguments in support of a new trial. First, Mr. Lenkart argues that his trial counsel was ineffective. Specifically, Mr. Lenkart claims that his trial counsel: (1) failed to investigate, analyze, and present physical evidence; (2) failed to formulate a defense theory and to request jury instructions consistent with that theory; (3) failed to obtain ele-

ments instructions addressing *mens rea* as to consent; (4) failed to ask the trial judge for jury instructions on mistake of fact; and (5) made several inconsistent statements throughout the trial. Second, Mr. Lenkart argues that the trial judge erred in several of its evidentiary rulings throughout the trial. Specifically, Mr. Lenkart argues the trial court improperly admitted several hearsay statements, prior bad acts evidence, and sexual predisposition evidence. Third, Mr. Lenkart argues that the prosecutor engaged in misconduct when she referenced statements made in the preliminary hearing and when she asked a witness to comment on the credibility of another witness's testimony. Fourth, Mr. Lenkart argues the trial judge erred when he summarily dismissed Mr. Lenkart's motion to arrest judgment. Finally, Mr. Lenkart asserts that the trial court should have resolved his mental health records motion before Mr. Lenkart filed this appeal. Mr. Lenkart argues that these errors, either individually, or cumulatively, require us to reverse his conviction and order a new trial.

¶ 23 The State disagrees that a new trial is warranted. First, the State argues that Mr. Lenkart has failed to establish any of his claims for ineffective assistance of counsel because he has failed to show that his trial counsel's performance "fell below an objective standard of reasonableness" or that he has suffered any prejudice as a result of his counsel's representation. Rather, the State asserts that Mr. Lenkart's trial counsel's actions were "tactical decisions" based on reasonable trial strategy. Next, the State argues that we should not address Mr. Lenkart's arguments regarding the trial judge's evidentiary errors or prosecutorial misconduct because these issues were not properly preserved. Finally, the State argues that the trial court did not err when it summarily denied Mr. Lenkart's motion to

---

**3.** *See, e.g., State v. Allen*, 2005 UT 11, ¶ 50, 108 P.3d 730; *State v. Colwell*, 2000 UT 8, ¶ 12, 994 P.2d 177.

**4.** *See State v. Templin*, 805 P.2d 182, 185–86 (Utah 1990).

**5.** *Id.* at 186; *see also State v. Hales*, 2007 UT 14, ¶ 37, 152 P.3d 321.

**6.** *Hales*, 2007 UT 14, ¶ 37, 152 P.3d 321.

**7.** *Id.* Because this appeal comes to us on a motion for a new trial, there are few, if any, factual findings to review. Thus, we "remain free to make an independent determination of [the] trial court's conclusions." *Id.* (internal quotation marks omitted).

**8.** *State v. Blake*, 2002 UT 113, ¶ 6, 63 P.3d 56 (internal quotation marks omitted).

arrest judgment because motions to arrest judgment should be granted only in a very limited context related to insufficiency of the evidence claims—a situation the State argues is clearly not present in this case.

■ ¶ 24 We conclude that Mr. Lenkart's trial counsel rendered ineffective assistance when he failed to analyze and present certain exculpatory physical evidence that would have been available to him had he performed an adequate investigation. Although other aspects of the trial proceedings give us cause for concern, we do not reach the remainder of Mr. Lenkart's claims of error because trial counsel's performance, standing alone, was both deficient and prejudicial and warrants reversal.[9] Because we conclude that Mr. Lenkart is entitled to a new trial, we also reverse the trial court's decision to deny Mr. Lenkart's motion for access to K.H.'s mental health records and remand this issue for the trial court to consider the merits of the motion.

I. MR. LENKART'S TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO INVESTIGATE AND PRESENT EXCULPATORY PHYSICAL EVIDENCE AT TRIAL

■ ¶ 25 The Sixth Amendment to the United States Constitution guarantees all defendants the right to effective assistance of counsel.[10] To determine whether a defendant received this constitutionally guaranteed level of representation, we examine counsel's performance under the test announced in *Strickland v. Washington*.[11] Under *Strickland*, the defendant bears the heavy burden of satisfying both of the following prongs: " 'First, the defendant must show that counsel's performance was deficient' "[12] "Second, the defendant must show that the deficient performance prejudiced the [outcome of his case]."[13] Although in hindsight it may be easy for us to second guess counsel's actions, we must appreciate that an attorney's job is to act quickly, under pressure, with the best information available, and that there is a wide "range of legitimate decisions regarding how best to represent a criminal defendant."[14] Thus, as a reviewing court, we must "indulge in a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," and that "under the circumstances, the challenged action might be considered

9. After oral argument, the State submitted a rule 24(j) letter challenging a statement defense counsel made at oral argument. The thrust of the State's letter is that during oral argument, defense counsel improperly represented to this court that Mr. Lenkart had personal knowledge that his trial counsel did not consult with any experts, when in fact, Mr. Lenkart's affidavit states that his lawyer told him that he "had his own experts he would consult if necessary," and that to Mr. Lenkart's knowledge, trial counsel never consulted with anyone. In response to the State's letter, Mr. Lenkart's appellate counsel filed a motion to strike, arguing the State's letter falls outside the scope and purpose of rule 24(j) because it does not contain any authorities or refer to any pages in the briefing to supplement the record.

Although the State's letter does not comport with the requirements of Utah Rule of Appellate Procedure 24(j), no purpose would be served in striking the State's letter in this case. *See Beynon v. St. George–Dixie Lodge # 1743, Benevolent & Protective Order of Elks*, 854 P.2d 513, 519 (Utah 1993) (stating that in spite of a rule 24(j) violation, no purpose would be served in striking the supplemental letter, but cautioning future parties to "refrain from stretching the boundaries of what is acceptable under rule 24(j)"). Regardless of whether Mr. Lenkart had personal knowledge as to whether his trial counsel consulted experts about the physical evidence, the State does not dispute that Mr. Lenkart's trial counsel failed to have the physical evidence from the Code R kit tested. Thus, the State's letter is immaterial to the outcome of this case and we need not entertain this issue.

10. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence."); *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

11. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

12. *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

13. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

14. *Id.* at 694, 104 S.Ct. 2052.

sound trial strategy." [15]

¶ 26 After reviewing the record in this case, we conclude that even under this deferential standard, Mr. Lenkart's trial counsel failed to render effective assistance. We first discuss and analyze the deficient performance prong of the *Strickland* test and then turn to the question of prejudice.

### A. Mr. Lenkart's Trial Counsel Rendered Deficient Performance

¶ 27 In order to demonstrate ineffective assistance of counsel, "the defendant must [first] show that counsel's performance was deficient." [16] This requires a defendant to show that counsel made very serious errors.[17] Indeed, a defendant must identify specific "acts or omissions" which, under the circumstances, "show that counsel's representation fell below an objective standard of reasonableness." [18] To determine whether "counsel's performance was objectively reasonable in light of all the circumstances, we look to prevailing professional norms. In accordance with these norms, our cases recognize that counsel has an important duty to adequately investigate the underlying facts of the case." [19] This is "because investigation sets the foundation for counsel's strategic decisions about how to build the best defense." [20]

¶ 28 A review of the record reveals that Mr. Lenkart's trial counsel failed to fulfill his duty to conduct an adequate investigation of the facts and evidence in this case, and thus, his performance was deficient under the first prong of the *Strickland* standard. We have repeatedly held that one of criminal defense counsel's most fundamental obligations is to investigate the underlying facts of a case.[21] This duty is not optional; it is indispensable. As we stated in *Taylor*, "failing to investigate because counsel does not think it will help does not constitute a strategic decision, 'but rather an abdication of advocacy.'" [22]

¶ 29 Mr. Lenkart has demonstrated that his trial counsel failed to adequately investigate his case and that had his counsel done so, he would have been able to present exculpatory physical evidence at trial for the jury to consider. Shortly after hiring counsel to defend him, Mr. Lenkart asked his counsel to investigate the physical evidence in the case. A Code R kit was collected on the night of the sexual encounter and Mr. Lenkart wanted its contents analyzed. In a sworn affidavit, Mr. Lenkart states that he suggested to his attorney that he pursue testing and expert analysis of "all the physical evidence in the case, because [he] believed it would confirm the truthful testimony [he] would provide in court." In response, trial counsel stated that he would consult his own experts if he thought it was necessary. However, it is undisputed that prior to trial, the physical evidence from the Code R kit was never analyzed and the results of the post-trial analysis were never presented to the jury. The reason for counsel's decision not to investigate this evidence is unclear.

¶ 30 At trial, the State called the Code R nurse to testify. Mr. Lenkart's trial counsel did not call any experts to contradict or otherwise question her testimony. The Code R nurse told the jury that during the Code R examination, she observed vaginal tearing and that K.H. had complained of tenderness. The nurse also told the jury that she had to

---

15. *Id.* at 695, 104 S.Ct. 2052 (internal quotation marks omitted).

16. *Id.* at 687, 104 S.Ct. 2052.

17. *See id.*

18. *Id.* at 688, 690, 104 S.Ct. 2052.

19. *State v. Hales*, 2007 UT 14, ¶ 69, 152 P.3d 321 (internal quotation marks omitted).

20. *Id.*

21. *See id.; see also Houskeeper v. State*, 2008 UT 78, ¶ 38, 197 P.3d 636 ("This court has found that counsel's performance falls below an objective standard of reasonableness when counsel does not make a reasonable investigation" (quoting *Templin*, 805 P.2d at 188)).

22. *Taylor v. State*, 2007 UT 12, ¶ 53, 156 P.3d 739 (quoting *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir.2005); *see also Kimmelman v. Morrison*, 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (internal quotation marks omitted)); *Templin*, 805 P.2d at 188.

remove a tampon from K.H.'s vagina with tweezers. The Code R nurse testified that in her opinion, these observations were consistent with the occurrence of rape.

¶ 31 Mr. Lenkart's attorney questioned the Code R nurse on cross-examination. And although the Code R nurse admitted it was possible that K.H.'s injuries could have been the result of consensual intercourse, Mr. Lenkart's trial counsel did not present any additional evidence or expert testimony to corroborate this conclusion. Thus, as to the physical evidence, the jury considered only the testimony of the Code R nurse, which strongly weighed in support of K.H.'s accusations.

¶ 32 The rest of the evidence presented to the jury primarily consisted of he-said-she-said statements from the parties involved, thus presenting a credibility contest between Mr. Lenkart and K.H. Mr. Lenkart told the jury his version of the events, and K.H. presented her conflicting testimony. The parties' testimony differed on two key points. First, was the issue of consent. Mr. Lenkart admitted to engaging in many of the same sexual acts K.H. described, but testified to the jury that K.H. consented to them. In contrast, K.H. testified that none of the acts were consensual, and that she asked Mr. Lenkart on numerous occasions to stop what he was doing. Second, although the parties agreed that they engaged in many of the same sexual acts, their testimony conflicted as to whether the parties engaged in oral sex, the act which formed the basis of Mr. Lenkart's sodomy charge. Mr. Lenkart testified that no oral sex occurred. K.H.'s testimony was the direct opposite. At trial, she stated that she specifically remembered that Mr. Lenkart "put his mouth on [her] genitals" and that she told him to stop. The jury must have believed K.H. because they found Mr. Lenkart guilty of all charges.

¶ 33 After trial, Mr. Lenkart fired his trial counsel and hired new counsel to prepare his motion for a new trial. His new counsel investigated the facts of the case and requested that the physical evidence be tested. The Code R kit was analyzed and Mr. Lenkart's new counsel submitted an affidavit from a reputable medical expert who concluded that the results of the Code R kit were more consistent with consensual rather

than nonconsensual intercourse. Perhaps most significantly, the Code R test came back negative for the presence of salivary amylase, which directly supported the claim that no oral sex occurred.

¶ 34 The State counters that trial counsel's decision not to investigate or present physical evidence was a strategic decision. The State argues that trial counsel "reasonably could have concluded" that asking the state crime lab to test the Code R kit "would have undermined Defendant's consent defense" because if "the results came back positive [ ] it would have constituted irrefutable proof that [Mr. Lenkart] lied about not having oral sex with [K.H.]." The State also argues that Mr. Lenkart's expert would not have added anything at trial because the Code R nurse already admitted on cross-examination that the Code R evidence was also consistent with consensual intercourse. We are unpersuaded by these arguments.

¶ 35 We cannot imagine a circumstance in which trial counsel could justify declining to test physical evidence that his client reasonably believes would be exculpatory. Mr. Lenkart asked his attorney to test the physical evidence because he was confident it would support his version of the events. Trial counsel had no reason to disbelieve Mr. Lenkart and had little to lose in performing the investigation. The decision of Mr. Lenkart's trial counsel not to investigate this evidence cannot "constitute a strategic decision."

¶ 36 We conclude that Mr. Lenkart's trial counsel rendered deficient performance when he failed to seek testing of the physical evidence in this case. His trial counsel should have made an "adequate inquiry" into the facts and available evidence in the case before making a reasonable decision on how to proceed.

¶ 37 Having concluded that Mr. Lenkart's trial counsel's performance was deficient, we now turn to the question of whether this deficient performance resulted in prejudice. We conclude that it did.

B. *Mr. Lenkart's Trial Counsel's Deficient Performance Resulted in Prejudice*

¶ 38 Once a defendant demonstrates that his trial counsel's performance

was deficient, we must then determine whether the deficient performance resulted in prejudice.[23] "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [24] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." [25] When we examine counsel's alleged errors, we "consider the totality of the evidence" to determine whether the errors "alter[ed] the entire evidentiary picture" and whether the verdict is supported by the record.[26]

¶ 39 While the trial court stated that Mr. Lenkart's trial counsel may have rendered deficient performance, the trial judge concluded that Mr. Lenkart failed to show that he was prejudiced by his counsel's errors. In its order denying Mr. Lenkart's motion for a new trial, the trial judge stated, "Although Ms. Bryner Brown's affidavit might have added some credibility to [Mr. Lenkart's] account, in light of [the Code R nurse's] admissions, Ms. Bryner Brown's testimony would not have been material . . . and does not change the evidentiary picture presented to the jury." We disagree.

¶ 40 We conclude that Mr. Lenkart's trial counsel's failure to investigate and present an expert opinion concerning the presence of physical exculpatory evidence to the jury was a prejudicial error affecting the entire evidentiary picture at trial. This error undermines our confidence in the outcome of Mr. Lenkart's trial.

¶ 41 We conclude that if Mr. Lenkart's trial counsel had presented the Code R kit test results at trial, it would have affected the entire evidentiary picture. As discussed above, the narrative at trial was largely a credibility contest between Mr. Lenkart and K.H. K.H. presented her version of the

events, which was followed largely by cumulative testimony of her statements to others. Mr. Lenkart offered a different version of the night's events. The Code R nurse's testimony on direct examination supported K.H.'s testimony, and the prosecutor heavily referenced and emphasized this testimony throughout the proceedings. For example, in closing argument the prosecutor stated:

> When we look at the [Code R] Nurse['s] [testimony], and . . . the chart of those injuries that she found[,] and the one injury, the laceration which she indicates, she told you a lot of times [that it] is found in non-consensual sexual encounters because the woman is not assisting in the penetration, not tilting her pelvis, all of those things. . . . [S]he told you that the injuries she found are consistent with non-consensual sex.

The prosecutor also used the Code R nurse's testimony to make an argument about K.H.'s tampon. She told the jury:

> I find it fairly compelling that [K.H. was] on her period at this time and has a tampon in. If you believe the defendant's story, she's completely lucid. She's completely with it. She's not intoxicated at all. Why doesn't she remove the tampon before she goes to have sex? I can't imagine that would feel very good. And it's almost a little embarrassing. I just can't believe you would go with a perfect stranger, completely lucid, and have sex while you're on your period with a tampon still in.

And finally, the prosecutor's closing argument also emphasized the untested Code R kit to support the sodomy charge:

> You know we have an account that yes, oral sex occurred, and I'm thinking how is [the defendant] going to get around the tampon issue? What is he going to say about the string? Well, he just kissed her on the outside of her underwear. . . . Forcible sodomy, that's just oral sex. The defendant put his mouth on her vagina.

These statements reveal that the limited testimony of the Code R nurse was central to

---

23. *See Hales,* 2007 UT 14, ¶ 86, 152 P.3d 321; *Templin,* 805 P.2d at 186.

24. *Strickland,* 466 U.S. at 687, 698, 104 S.Ct. 2052; *Templin,* 805 P.2d at 186.

25. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

26. *Id.* at 696, 104 S.Ct. 2052; *accord Templin,* 805 P.2d at 187.

the State's theory of nonconsent. Without another opinion to counter these statements or any physical evidence to refute it, the jury was left with a lopsided evidentiary picture in K.H.'s favor. Indeed, had the jury been presented with the test results of the Code R kit and the testimony of Ms. Bryner Brown, the factual picture would have been completely transformed. First, the test results strongly corroborated Mr. Lenkart's testimony that no oral sex occurred. Second, Ms. Bryner Brown's testimony would have provided an alternate explanation for the tampon. Instead of suggesting that the presence of the tampon inferred nonconsensual sexual conduct, Ms. Bryner Brown's testimony would have suggested that the presence of tampons is common in these examinations, either due to forgetfulness, or because many women intentionally leave tampons in to enhance the sexual experience. Finally, had this evidence been presented at trial, it would have undermined K.H.'s testimony and bolstered Mr. Lenkart's credibility. The jury would have had concrete physical evidence from which they could conclude that no oral sex occurred between the parties. They would have been able to evaluate testimony explaining how the presence of the tampon was consistent with consensual intercourse. We conclude that this testimony would have shifted the credibility scale in Mr. Lenkart's direction, thus changing the entire evidentiary picture at trial.

¶ 42 We also conclude that Mr. Lenkart's conviction was "not strongly supported by the record." [27] A rape case where the sole issue at trial is consent presents a unique circumstance not present in many other rape trials. In consent cases, physical evidence is often sparse, and few, if any witnesses are able to aid the jury in evaluating the subjective mindset of the parties to the encounter. Indeed, many of these cases hinge on a he-said-she-said credibility contest between the alleged perpetrator and the victim. Thus, when physical evidence comes to light suggesting the alleged perpetrator may not have committed the crime, the entire evidentiary picture shifts, and we are less confident that the he-said-she-said determination was accurately resolved. We conclude that this is particularly true in Mr. Lenkart's case.

¶ 43 The rape trial was largely a credibility contest between Mr. Lenkart and K.H. At the time of trial, the Code R kit had not been analyzed. The Code R nurse was the only expert who testified about the physical evidence at trial. Her testimony on direct examination concerned only her examination of K.H. on the night of the encounter; it did not concern the results of the Code R analysis. The Code R nurse testified that her observations supported a nonconsensual encounter. But on cross-examination, she stated that the physical evidence was also consistent with a consensual encounter. Thus, the testimony surrounding the physical evidence was particularly equivocal.

¶ 44 We conclude that had the post-trial physical evidence been presented to the jury, it would have changed the record completely. It would have changed the way the jury evaluated the credibility of the parties; it would have injected doubt into the prosecution's case. We are confident that had the jury been able to consider the existence of physical exculpatory evidence in support of Mr. Lenkart's testimony, there is a reasonable probability that the outcome of the trial would have been different. Mr. Lenkart's trial counsel's decision not to investigate or present this evidence deprived Mr. Lenkart of that opportunity.

¶ 45 We conclude that both prongs of the *Strickland* test have been satisfied and therefore, Mr. Lenkart was denied his constitutional right to effective assistance of counsel. We therefore reverse the order of the trial court, vacate Mr. Lenkart's conviction, and remand for a new trial.

II. WE REVERSE THE TRIAL COURT'S DECISION TO DENY MR. LENKART'S MOTION FOR ACCESS TO THE VICTIM'S MENTAL HEALTH RECORDS AND REMAND THIS ISSUE TO THE TRIAL COURT FOR CONSIDERATION OF THE ISSUE UNDER THE STANDARD ARTICULATED IN *STATE v. WORTHEN*

¶ 46 Having concluded that Mr. Lenkart has met his burden to establish that his

27. *Templin,* 805 P.2d at 188.

trial counsel was ineffective, the only issue left to resolve concerns Mr. Lenkart's motion for an in camera review of K.H.'s mental health records. Because the trial court denied Mr. Lenkart's request for a new trial, it did not consider the merits of this motion.[28]

¶ 47 Utah Rule of Evidence 506(b) "protects, as privileged, communications between a health care provider and a patient if the communications are made 'in confidence and for the purpose of diagnosing and treating the patient.'"[29] Although mental health records are generally privileged documents, there are three exceptions to this rule.[30] Mr. Lenkart argues that the exception contained in rule 506(d)(1) applies to this case.

 ¶ 48 Under rule 506(d)(1) "[n]o privilege exists under this rule ... [if the patient's] physical, mental, or emotional condition ... is an element of any claim or defense."[31] In our recent case, *State v. Worthen,* we addressed the rule 506(d)(1) exception at great length.[32] In that case, we concluded that to determine the applicability of the 506(d)(1) exception, the trial court must move sequentially through three analytical steps. First, the trial court must determine whether the patient suffers from a physical, mental, or emotional *condition* as opposed to mental or emotional problems that do not rise to the level of a condition.[33] On this issue we stated, "[a] condition is not transitory or ephemeral. A mental or an emotional condition is a state that persists over time and significantly affects a person's perceptions, behavior, or decision making in a way that is relevant to the reliabili-

ty of the person's testimony."[34] If the trial court determines that the patient suffers from a condition, the trial court must next assess whether the patient's condition is "an element of any claim or defense."[35] Finally, the trial court must determine whether the defendant has shown with "reasonable certainty" that the mental health records will contain exculpatory evidence favorable to the defense.[36] This requires some type of "extrinsic indication that the evidence within the records exists, and will in fact, be exculpatory."[37]

¶ 49 Because *Worthen* was decided after the briefs in this case were filed, the parties were not able to frame their arguments in light of this new analysis. We thus conclude that it is appropriate to reverse the trial court's decision to deny Mr. Lenkart's motion and remand this issue to the trial court for consideration on the merits in the light of *Worthen.* On remand, we instruct the trial court to use the *Worthen* analysis to guide its decision.

## CONCLUSION

¶ 50 Mr. Lenkart's trial counsel rendered ineffective assistance of counsel when he failed to investigate and present certain exculpatory physical evidence that would have significantly altered the evidentiary picture presented to the jury. Because we find this error to be both deficient and prejudicial, we remand this case for a new trial. On remand, we instruct the trial court to consider the merits of Mr. Lenkart's motion for access

---

**28.** On appeal, Mr. Lenkart argues that the trial court erred in not considering the merits of his mental health records motion in its original decision. Because we reverse for a new trial and remand this issue to the trial court, we find it unnecessary to opine on whether the trial court should have considered the merits of this issue before this appeal.

**29.** *State v. Worthen,* 2009 UT 79, ¶ 14, 222 P.3d 1144 (quoting UTAH R. EVID. 506(b)).

**30.** *Id.;* UTAH R. EVID. 506(d).

**31.** UTAH R. EVID. 506(d).

**32.** *See Worthen,* 2009 UT 79, ¶¶ 14–42, 222 P.3d 1144.

**33.** *Id.* ¶¶ 20–21.

**34.** *Id.* ¶ 21.

**35.** *See id.* ¶¶ 19, 29–37; UTAH R. EVID. 506(d)(1).

**36.** *Worthen,* 2009 UT 79, ¶¶ 15, 38–42, 222 P.3d 1144.

**37.** *Id.* ¶ 38 (internal quotation marks omitted); *see also State v. Blake,* 2002 UT 113, ¶ 19, 63 P.3d 56 (noting the "reasonable certainty" test requires a defendant to show "the sought-after records actually contain exculpatory evidence ... 'which would be favorable to his defense.'" (alteration in original) (quoting *State v. Cardall,* 1999 UT 51, ¶ 30, 982 P.2d 79)).

to the victim's mental health records before moving forward.

¶ 51 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice LEE concur in Justice NEHRING's opinion.