2023 UT App 72

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
EMANUEL CARRANZA,
Appellant.

Opinion
No. 20210167-CA
Filed July 6, 2023

Second District Court, Ogden Department
The Honorable Ernest W. Jones
No. 181900252

Emily Adams, Freyja Johnson, and Hannah
Leavitt-Howell, Attorneys for Appellant

Sean D. Reyes and Karen A. Klucznik,
Attorneys for Appellee

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

OLIVER, Judge:

¶1     Emanuel Carranza was charged with kidnapping a man he encountered in a park. The events surrounding the kidnapping itself were relayed entirely by the victim. For his part, Carranza claimed that there was no kidnapping because the victim voluntarily hung out with him but then subsequently embellished the encounter. Carranza insisted there were witnesses who could corroborate his version of events. But Carranza's trial was well underway by the time his attorney contacted a key witness and concluded that he would be of no help to the case. Following his conviction, Carranza filed a motion for a new trial, asserting that

his attorney provided ineffective assistance by failing to investigate this witness, along with several others. The district court denied the motion, determining that Carranza was not prejudiced by the alleged deficient performance. On appeal, we come to the contrary conclusion that Carranza did receive ineffective assistance of counsel and reverse his convictions. Additionally, because it may arise again on remand, we provide guidance on an evidentiary issue that forms the basis of another ineffective assistance of counsel claim raised by Carranza.

## BACKGROUND[1]

### *The Kidnapping*

¶2 Ron[2] was walking through a park on February 1, 2018, when Carranza, who was unknown to Ron, approached him and asked who he was. Carranza introduced himself as "Cholo from 18th Street."[3] Carranza started acting "aggressively" as he forced Ron to a bench and held him at gunpoint with a 9mm handgun. Carranza took Ron's hat, shoes, and sweater and "threw them." Carranza also took Ron's cellphone and wallet. Carranza searched Ron's backpack and then called someone to pick them up from the park.

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (cleaned up).

2. Ron is a pseudonym.

3. The State indicated that "18th Street" refers to a gang.

¶3     Carranza forced Ron into the back seat of the car he had called, making Ron lay his head on the floor and pointing the gun at Ron's hip. Carranza told the driver "to take him somewhere 'to dust this fool.'" Carranza eventually decided that he was instead going to take Ron to a house, where he would keep Ron "as a little bitch." They arrived at a house, where Carranza led Ron to a room and told him to lie on the floor. Carranza proceeded to cut straps off Ron's backpack and use them to tie Ron's hands behind his back. Carranza tied Ron's feet with another strap or belt. The next day, on February 2, Carranza untied Ron and made him clean the house and wash the dishes under Carranza's watch. Carranza then gave Ron beer and candy.

¶4     Later in the day, Carranza gave Ron shoes so they could go for a walk. They made their way to a brown car, which had its keys stashed under the bumper. They got in, and Carranza drove around the block twice until they encountered a white car. Upon seeing the white car, Carranza told its occupants, "This is 18th Street," and proceeded to fire his gun at them four or five times. Both cars then fled the scene.

¶5     Carranza stopped at a gas station and ordered Ron to pay for gas and buy him a drink while he refueled the car. Ron entered the store alone while Carranza watched Ron from the gas pump. Ron attempted to ask the store clerk for help, but the clerk was busy on the phone and did not hear him.

¶6     Carranza and Ron returned to Carranza's room at the house. Despite being unbound and alone on occasion, Ron still "feared for [his] life," and he did not want "to risk getting shot trying to run away."

¶7     A few hours later, Carranza, armed with a gun, took Ron to a nearby store. Carranza told Ron he would release him if he would buy some 9mm ammunition. Carranza kept Ron's backpack with him in the car to prevent him from fleeing.

¶8      Ron entered the store, went to the sporting goods counter, and told the clerk that he needed to call 911 because he had been "kidnapped" and was "in fear for [his] life." The clerk took Ron to the customer service desk, where he called 911.

¶9      The police arrived and spoke to Ron. Meanwhile, Carranza drove out of the store's parking lot. After a chase and crash into a police car, Carranza was apprehended. Officers found a backpack in the car, with its contents scattered on the passenger seat and floor. No gun was found on Carranza or in the car. Officers searched Carranza's room at the house and found straps that had been cut from the backpack, beer and candy, a digital scale, a marijuana pipe, and a bottle containing "miscellaneous pills."

¶10     The State charged Carranza with aggravated kidnapping, aggravated robbery, felony discharge of a firearm, possession of a firearm by a restricted person, failure to respond to an officer's signal to stop, and aggravated assault (related to the crash with the police car). All of the charges except failure to stop were enhanced based on Carranza's status as a habitual offender.

*Carranza's Pretrial Complaints About Trial Counsel*

¶11     In March and April 2019, Carranza sent three letters to the district court complaining that his counsel (Trial Counsel) was not communicating with him and was pressuring him to plead guilty. In January 2020, about two weeks prior to the trial, Carranza filed a pro se motion for new counsel.

¶12     At a hearing on January 29, 2020, Carranza informed the court that Trial Counsel had not "look[ed] for two witnesses" or at "certain statutes." Trial Counsel told the court that Carranza felt he had not "gotten some things done" and had not "prepared properly." But Trial Counsel offered that he "could probably remedy that" if the trial "were continued."

¶13    At the pretrial conference on February 5, 2020, Carranza asked the court for a continuance and new counsel:

> Your Honor, over and over I've asked [Trial Counsel] to do things. He doesn't do them . . . . I need a conflict attorney, we need . . . a continuance on this trial.
>
> . . . .
>
> [Trial Counsel] is not ready. I've asked him to locate witnesses for me. He declined to do it. And two weeks before trial he decides to have someone talk to me about it . . . . He's not ready [on any] level for this.

The court declined to continue the trial or appoint new counsel.

*The Trial*

¶14    At trial, Ron testified about the events of the kidnapping. The State also called the store clerk and the store manager to testify.

¶15    The clerk testified that after she had finished helping another customer, she approached Ron and asked if she could help him. She said Ron stared at the floor and did not look at her as he disclosed "that he was nervous and embarrassed to tell [her] that he had been kidnapped." Ron told her Carranza had "sent him in to buy ammunition" and he was "wearing [Carranza's] shoes." The clerk testified the shoes "really didn't match what he was wearing." The clerk called her manager to apprise her of the situation and then walked Ron up to the service desk so that he could call the police. The manager testified the clerk told her Ron was "trying to buy ammunition and that he had stated that he had been kidnapped." The manager spoke to Ron, who asked her to call

the police. She dialed the police and handed the phone to Ron. The manager testified that police cars arrived with sirens on and began chasing a car that had been in the parking lot.

¶16 After the State rested its case, Trial Counsel rested Carranza's case without calling any witnesses.

¶17 In closing, the State told the jury that

> the key thing about this case is a lot of the conduct between [Carranza] and [Ron] is unknown to any other witnesses, a lot of it is in private, being kidnapped at the park, being taken in the brown car with [Carranza], being stored in [Carranza's] bedroom, all of that is not readily apparent to a lot of witnesses. So what you ultimately have to do in looking at the evidence, looking at the statement from [Ron], is to look at the other corroborating evidence, other evidence you have from other witnesses at the various crime scenes involved in this case.

¶18 Trial Counsel argued in closing that Ron essentially fabricated the kidnapping story:

> [Ron] is hanging out with . . . Carranza and for whatever reason he decides to make up a story, what's he going to do? He's going to take the basics, the skeleton, if you will, and he's going to flesh it out. He's going to add, he's going to embellish it.

¶19 The jury convicted Carranza of all the charges except for aggravated assault and found the convictions were subject to enhancements.

*Motion for New Trial*

¶20 After his conviction, Carranza filed pro se motions for a new trial and for the appointment of conflict counsel (Conflict Counsel). After appointment, Conflict Counsel filed a motion for a new trial, which, as relevant here, included an argument that Trial Counsel had rendered ineffective assistance "for not investigating a crucial defense witness" (Witness) until after the trial had started. Carranza asserted that Witness would have provided evidence that (1) he saw Carranza and Ron at the house the day after the alleged kidnapping, (2) Ron initially appeared normal at the house, (3) Ron left the house for about thirty minutes while Carranza stayed in the house, and (4) Ron "seemed worried and possibly high when he returned."

¶21 At the evidentiary hearing on this issue, the court heard the testimony of Witness, Trial Counsel's investigator (Investigator), Carranza, and Trial Counsel.[4]

a. Witness's Testimony

¶22 Witness owned a house where Carranza would occasionally stay in an extra room. Witness testified that on February 2, 2018, Carranza and Ron were in Carranza's room. He talked with Carranza and Ron for roughly two hours. He described Ron's demeanor as being "normal," and he said that Ron did not "seem afraid" or like he did not "want to be there." Witness said that during their conversation, Ron "walked out [of] the room, out [of] the house." Carranza and Witness stayed behind and continued to talk, and Ron returned about thirty minutes later. Witness "notice[d] something different" about Ron on his return, and he wondered if Ron had gone "to go get high

---

4. Another individual testified during the evidentiary hearing, but on appeal, Carranza makes no ineffective assistance claim regarding this witness.

because he was kind of like a little paranoid" and "anxious." Ron kept asking Carranza "for a ride or for the car," and Carranza "kept telling him no" because the car did not have plates. Carranza eventually "got frustrated" and left with Ron. Witness said that was the last time he spoke with them.

¶23 Witness also testified about his interactions with Trial Counsel. He said Trial Counsel contacted him "a month [or] like a couple weeks" before Carranza's trial. Witness said he thought "it was kind of strange" that Trial Counsel waited so long to contact him given that some events surrounding the alleged kidnapping had taken place in his house: "I thought I would be . . . the number one witness because it's my home. It's my spot . . . ." Witness said that he met with Trial Counsel at Trial Counsel's office, that Trial Counsel asked him if he "knew anything about any kidnapping or whatnot," and that Witness shared the same information recounted above. Witness said Trial Counsel told him that he would be in contact if necessary, but Witness never heard from Trial Counsel.

b.    Investigator's Testimony

¶24 Investigator testified that he first became involved in this case on January 29, 2020—less than two weeks before the trial started on February 10—when Trial Counsel asked him to meet with Carranza about "some investigating that [Carranza] wanted done that hadn't been done yet." Carranza told Investigator about Witness. Investigator explained that because Carranza was being represented by a public defender, Trial Counsel was required to submit an authorization form before Investigator could begin investigating the case. But Trial Counsel did not submit the form until five days later, on February 3. While Investigator had done the "preliminary work" of scoping out Witness's house and leaving "a card" on Witness's door, he could not begin his formal investigation until receiving the form. Adding to these delays, Investigator did not receive discovery from Trial Counsel—which

included factual and witness information—until late on February 9, the night before the trial started. Moreover, Investigator was unaware that the trial was starting the next morning because Trial Counsel had never informed him of it.

¶25 Investigator stated that he went to Witness's house the following morning, which was the day the trial started. Receiving no answer, he left his card wedged in the door. Witness called Investigator the next day and told him "that he would be able to testify that there had been no kidnapping, nobody held at his house." Investigator set up a phone call between Trial Counsel and Witness during lunch that same day, the second day of the trial.

c.      Carranza's Testimony

¶26 Carranza testified he told Trial Counsel on March 27, 2019—ten months before trial—that Trial Counsel needed to contact Witness, along with three other individuals, who could testify about his interactions with Ron during the time of the alleged kidnapping. Carranza testified he asked Trial Counsel about contacting these individuals, including Witness, "at least a half a dozen times" after March 27, 2019, as well.

¶27 At a hearing on January 29, 2020, Trial Counsel told Carranza he had not investigated any of the witnesses Carranza had identified. Carranza said he let the court know the investigation "hasn't happened." Carranza testified that after the hearing, he was able to meet with Investigator and told him about the individuals who could testify on his behalf, including Witness.

d.      Trial Counsel's Testimony

¶28 Trial Counsel testified he did not recall whether Carranza provided him with specific information "as to witnesses to follow up on." But he did remember speaking to Witness by phone

during lunch on one of the trial days. He recalled that Witness "owned the house where . . . Carranza was supposed to have held [Ron] against his will." Trial Counsel offered this account of his conversation with Witness:

> [H]e said . . . I go to work every day. I get up . . . at 5:00 or something like that. I get up, I go to work, I come home. . . . I really don't have much life. And I asked him if . . . Carranza had been staying there. And he said no, I don't know anything about it. If . . . Carranza had been there[,] . . . I would have known about it, but I didn't know it. I didn't know he was there. And [Witness] seemed adamant . . . either that he didn't know or that . . . Carranza was not there at the time that was alleged, that he just wasn't at that home at all.

Trial Counsel decided not to have Witness testify because his testimony "would have made . . . [Carranza] look like a liar" and would "do more harm than good."

¶29 The district court rejected all aspects of Carranza's motion for a new trial, including his argument that Trial Counsel had rendered ineffective assistance for not investigating Witness. Specifically, the court concluded that Carranza was not prejudiced by the lack of investigation:

> Even if [Witness had] been investigated and testified at trial, the outcome would likely have remained the same. [Witness]'s testimony at the evidentiary hearing added very little to the analysis. [Witness] testified he spoke with [Ron] and Carranza. However, he did not know [Ron]. [Witness] testified [that Ron] was acting normal, but since he had never met [Ron] before he would not know what "normal" looked like. Further, [Witness]

adamantly denied Carranza was staying at his residence when he spoke with [Trial Counsel]. However, the evidence was clear Carranza was staying there. Carranza argues the jury could have found [Witness] credible, but it is just as likely they would not have found him credible. Thus, Carranza has not met his burden of proof to show he was prejudiced by [Trial Counsel] failing to investigate or call [Witness].

¶30   The court sentenced Carranza for each of his convictions.

ISSUES AND STANDARDS OF REVIEW

¶31   Carranza argues the district court incorrectly concluded that Trial Counsel's investigation of Witness did not prejudice Carranza. "When a defendant asserts a constitutional claim of ineffective assistance of trial counsel," we approach it as "a mixed question of law and fact. We review the trial court's application of the law to the facts under a correctness standard. If there are factual findings to review, we will not set them aside unless they are clearly erroneous." *State v. J.A.L.*, 2011 UT 27, ¶ 20, 262 P.3d 1 (cleaned up).

¶32   On appeal, Carranza additionally argues that Trial Counsel provided ineffective assistance when he did not raise a hearsay objection to the testimony offered by the store employees.[5] "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we

---

5. Because we conclude that Carranza is entitled to a new trial based on the ineffective assistance of Trial Counsel in neglecting to properly investigate, we would not need to address this issue. But since it might arise again on remand, we will consider it, albeit briefly.

must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Holsomback*, 2022 UT App 72, ¶ 19, 513 P.3d 82 (cleaned up).[6]

## ANALYSIS

¶33 "To ensure a fair trial, the Sixth Amendment of the U.S. Constitution guarantees the right to effective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 23, 309 P.3d 1160, *cert. denied*, 320 P.3d 676 (Utah 2014). We evaluate a claim of ineffective assistance under the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

### I. Failure to Investigate Witness

A. Deficient Performance

¶34 "Counsel's function is to assist the defendant, . . . [which includes] the overarching duty to advocate the defendant's cause . . . [by] bring[ing] to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. The Sixth Amendment relies "on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions." *Id.* Accordingly, the

---

6. Carranza raises other issues related to the district court's denial of his mistrial motion and Trial Counsel's failure to object to certain testimony from a police detective, as well as cumulative error. But given our disposition of this case on the first issue, we do not reach these other issues.

"proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*

¶35 "The American Bar Association Standards for Criminal Justice . . . maintain that . . . it is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *State v. Crestani*, 771 P.2d 1085, 1090 (Utah Ct. App. 1989) (cleaned up); *see also* ABA, *Criminal Justice Standards for the Defense Function*, Standard 4-4.1(c) (4th ed. 2017), https://www.americanbar.org/groups/crimi nal_justice/ standards/DefenseFunctionFourthEdition [https://pe rma.cc/ RUK8-TABY] ("Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter . . . ."). And our supreme court has "repeatedly held that one of criminal defense counsel's most fundamental obligations is to investigate the underlying facts of a case." *State v. J.A.L.*, 2011 UT 27, ¶ 28, 262 P.3d 1.

¶36 Accordingly, an attorney "has the duty to adequately investigate the underlying facts of the case because investigation sets the foundation for counsel's strategic decisions about how to build the best defense." *State v. Griffin*, 2015 UT 18, ¶ 33, 441 P.3d 1166 (cleaned up). As our supreme court has observed, "failing to investigate because counsel does not think it will help does not constitute a strategic decision, but rather an abdication of advocacy." *J.A.L.*, 2011 UT 27, ¶ 28 (cleaned up); *accord Taylor v. State*, 2007 UT 12, ¶ 53, 156 P.3d 739. "If counsel does not adequately investigate the underlying facts of a case, including the availability of prospective defense witnesses, counsel's performance cannot fall within the wide range of reasonable professional assistance." *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) (cleaned up). Succinctly put, counsel's "duty to conduct an adequate investigation of the facts and evidence" in a case "is not optional; it is indispensable." *J.A.L.*, 2011 UT 27, ¶ 28.

¶37 Under the standard set out by the United States Supreme Court,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690–91. From this perspective, we conclude that Trial Counsel performed deficiently in failing to timely investigate Witness because Trial Counsel deprived himself of the opportunity to develop an effective trial strategy.

¶38 There is no question that Trial Counsel was made aware of Witness—at the latest—on January 29, 2020, twelve days before the trial began on February 10.[7] But even in this admittedly short time, Trial Counsel did not act promptly to facilitate Investigator's contact with Witness. Instead, his failure to complete the necessary paperwork delayed Investigator's initial contact with Witness until the second day of the trial.

¶39 By Trial Counsel's own admission, his only conversation with Witness took place during a lunch break call on the second day of the trial. From this call, Trial Counsel concluded that

---

7. Carranza testified he told Trial Counsel to contact Witness about ten months before the trial. *See supra* ¶ 26. If Trial Counsel did receive this information nearly a year before trial, that would only lend additional support to Carranza's ineffective assistance claim.

calling Witness to testify would do more harm than good because Witness's potential testimony that Carranza was not at the house or that Witness did not know if Carranza was there on the day in question would make Carranza "look like a liar." We fail to see how Trial Counsel could have reached this conclusion based on such a cursory conversation with Witness. The lunch break call—conducted during the frenzy of the second day of trial—provided no opportunity for Trial Counsel to ask the probing questions necessary to evaluate Witness's usefulness to Carranza's case. For example, there is no evidence that Trial Counsel oriented Witness to the date in question to ensure that Witness knew what Trial Counsel was talking about or made sure to clarify whether he was asking if Carranza lived in the house or used a room there from time to time. Nor is there evidence that Trial Counsel asked follow-up questions of Witness.

¶40 Based on Trial Counsel's account, the conversation consisted of little more than Witness stating that he worked a lot and that he did not remember Carranza being at the house. But the spartan nature of the dialogue was likely due to the circumstances of the call. Consider what would have happened had Trial Counsel been even slightly more prompt—by perhaps a few days—in contacting Witness. He could have sat down with Witness in a less harried environment, explained Carranza's situation, provided essential details, and asked revealing questions of Witness.[8] Witness would likely have recounted the details he shared at the evidentiary hearing. After learning these details, Trial Counsel could have developed a superior trial strategy. It is difficult for us to see how any attorney could

---

8. We acknowledge that Witness claims he sat down with Trial Counsel at his office and offered a more complete account of his interaction with Carranza and Ron. *See supra* ¶ 23. If this is true, Trial Counsel's decision to ignore this information also falls below the standards of professional conduct.

develop a trial strategy without investigating the facts and evidence of a case before the trial starts. Stated differently, Trial Counsel was "not in a position to make a reasonable strategic choice" about his approach to mounting Carranza's defense "without first conducting a full investigation of the merits of the case." *State v. Hales*, 2007 UT 14, ¶ 83, 152 P.3d 321 (cleaned up).

¶41    Because Trial Counsel did not conduct an adequate investigation in a timely manner to inform his trial strategy and decisions, we conclude he performed deficiently in his representation of Carranza.

B.    Prejudice

¶42    "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Bonds*, 2023 UT 1, ¶ 53, 524 P.3d 581 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Here, we disagree with the district court and conclude Carranza was prejudiced by Trial Counsel's failure to timely investigate Witness.

¶43    Carranza's convictions for kidnapping, robbery, and possession of a firearm rested primarily on Ron's testimony. In fact, the State admitted that "the key thing about this case is a lot of the conduct between [Carranza] and [Ron] is unknown to any other witnesses, a lot of it is in private, being kidnapped at the park, being taken in the brown car . . . , being stored in [Carranza's] bedroom." As the only witness to testify about these events, the State's case depended, in large part, on Ron's credibility. And because Trial Counsel did not present any

defense witnesses, the jury lacked any counterpoint to Ron's testimony. But if the jury had heard from Witness, there is a reasonable probability that Ron's credibility before the jury would have been compromised.

¶44    Witness's account of his interaction with Carranza and Ron would have directly challenged Ron's assertion that he had been kidnapped. Witness testified that Ron did not seem distressed or afraid when he visited with Ron and Carranza in his house. Witness said they were "just talking" during the two hours he spent with Carranza and Ron. Witness did not mention Ron being restrained in any way. On the contrary, Witness said that Ron freely departed from the house on his own about an hour after Witness arrived, leaving Witness and Carranza behind in the house. Ron later returned to the house and rejoined them in the room. And Witness's observation that Ron may have left the house "to go get high" because he seemed "paranoid" and "anxious" when he returned could have provided an explanation for Ron's account that Carranza had kidnapped him.

¶45    While the State points to the backpack straps, candy, and beer found in the room to corroborate Ron's testimony, this evidence equally corroborates Witness's version of events. The beer cans and candy wrappers could just as likely support Carranza's account that he and Ron stayed long enough at the house to consume beer and candy. And the drug paraphernalia located in the search of the room supports Witness's suspicion that Ron may have been using illegal drugs on the day in question, while the backpack straps may have been used to facilitate such drug use.

¶46    In short, with Witness's testimony providing a contradictory version of events, the entire evidentiary landscape of the case shifts. This fundamental shift undermines our confidence in the outcome of the trial. *See Gregg v. State*, 2012 UT 32, ¶ 30, 279 P.3d 396 (holding that in cases resting on "the victim's

credibility, . . . evidence affect[ing] the overall evidentiary picture . . . is sufficient to undermine our confidence in the trial's outcome"). We therefore conclude that Carranza was prejudiced by Trial Counsel's failure to timely investigate Witness.

¶47 Having determined that Trial Counsel performed deficiently in not timely investigating Witness and that Carranza was prejudiced by this lack of investigation, we conclude that Carranza received ineffective assistance of counsel. His kidnapping, robbery, and firearm convictions are therefore reversed.

## II. Alleged Hearsay Testimony

¶48 Because we reverse Carranza's convictions due to ineffective assistance of counsel, we need not address his other arguments. But Carranza has identified an issue "on appeal that will likely arise during retrial." *State v. Low*, 2008 UT 58, ¶ 61, 192 P.3d 867. And "in an effort to offer guidance that might be useful on remand, . . . we briefly discuss" the hearsay status of statements made by the store employees. *State v. Valdez*, 2021 UT App 13, ¶ 54, 482 P.3d 861.

¶49 Carranza asserts that the store clerk's testimony about what Ron told her and the manager's testimony about what the clerk told her constituted inadmissible hearsay. He complains that Trial Counsel provided ineffective assistance for failing to object to what he believes were "multiple instances of inadmissible hearsay testimony from the State's witnesses that improperly bolstered [Ron's] credibility."

¶50 We agree with the State that competent counsel could forgo objecting to this testimony on hearsay grounds since the testimony was admissible for either of two reasons. First, it could have been offered not for its truth but to explain the employees' actions in responding to Ron's requests. *See State v. McNeil*, 2013

UT App 134, ¶ 48, 302 P.3d 844, *aff'd*, 2016 UT 3, 365 P.3d 699 ("Where an out-of-court statement is offered simply to prove it was made, without regard to whether it is true, such testimony is not proscribed by the hearsay rule. . . . Often statements of this type merely reveal people's motives for later actions." (cleaned up)). Alternatively, at least portions of the testimony in question would have been admissible as containing an expression of Ron's present-sense impression that a kidnapping was ongoing. *See* Utah R. Evid. 803(1) (explaining that a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the rule against hearsay").

## CONCLUSION

¶51 Having determined that Carranza received ineffective assistance of counsel, we reverse his kidnapping, robbery, and firearms convictions and remand for further proceedings consistent with this opinion.

_____