**2015 UT App 230**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF S.S. AND A.S.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

S.E.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20140055-CA
Filed September 11, 2015

Sixth District Juvenile Court, Manti Department
The Honorable Paul D. Lyman
No. 1070937

Paul D. Dodd and Aaron P. Dodd, Attorneys
for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE JOHN A. PEARCE authored this Opinion, in which JUDGE
STEPHEN L. ROTH concurred. JUDGE MICHELE M. CHRISTIANSEN
concurred, with opinion.

PEARCE, Judge:

¶1      S.E. (Mother) appeals from the juvenile court's order
terminating her parental rights in her two boys, A.S. and S.S.
Mother argues that she received ineffective assistance from her
counsel at the termination trial and that the juvenile court failed
to adequately inquire into the reasons for her expressed
dissatisfaction with counsel. We agree that Mother received

ineffective assistance of counsel. We reverse the juvenile court's termination order and remand for further proceedings.

BACKGROUND

¶2     This appeal concerns Mother's right to parent A.S., born in July 2010, and S.S., born in June 2012. As of early 2012, Mother lived with A.S. and his father (Father).[1] Mother's two older children from a prior relationship, P.P. and S.P., also lived in the home.[2]

¶3     In May 2012, while Mother was jailed in an unrelated case, Father became upset at P.P. for "being disrespectful" to an uncle. During this episode, Father grabbed P.P. by the arm and hit him, causing "bruises and scratches on [P.P.'s] right forearm and scratches on both sides of his neck." Father also threw a beer can at P.P. and spat on him. The next day, while P.P. was at school, a teaching assistant noticed and reported the bruising and scratches. In response, the Division of Child and Family Services (DCFS) requested, and the juvenile court issued, a warrant to take P.P. and S.P. into protective custody. A.S. was placed in the care of relatives. The juvenile court adjudicated the three children as abused or neglected. After S.S. was born in June 2012, he was found to be a sibling at risk. Upon Mother's release from jail, the children were returned to her custody, subject to protective supervision services provided by DCFS.

¶4     Mother initially responded fairly well to those services. But by the fall of 2012, Mother had become non-compliant with

_____

1. Father is also the parent of S.S.

2. P.P. and S.P. were placed in Iowa with their biological father during the pendency of this proceeding and are not the subject of this appeal.

DCFS's supervision services. Mother was also jailed again. The juvenile court ordered P.P. and S.P. to be placed in the custody of their biological father in Iowa and ordered DCFS to take custody of A.S. and S.S. A.S. and S.S. were subsequently placed in a non-kinship foster home.

¶5      In January 2013, after Mother was released from jail, she moved to Iowa to be with P.P. and S.P. During the first few months of 2013, Mother called A.S. and S.S. only four times.[3] Mother did not maintain regular contact with DCFS, although the record reflects that in March 2013 she demanded that DCFS return A.S. and S.S. to her. During this time, Mother apparently had no contact with her appointed counsel in this matter (Trial Counsel).[4]

¶6      In April 2013, the juvenile court held a hearing to determine A.S. and S.S.'s placement. Mother did not attend the hearing. Trial Counsel was present. At the conclusion of the hearing, the juvenile court placed A.S. and S.S. in a foster home in Wyoming with foster parents that are relatives of Father.

¶7      Between April and July 2013, Mother remained in Iowa and did not visit A.S. and S.S. During this time, Mother was also arrested for theft in Iowa. She did not call A.S. and S.S. at all in April or May, but by June she began calling them more often. Between June 10 and August 14, Mother called A.S. and S.S. at least eight times, or almost once a week. During this period, DCFS had difficulties contacting Mother by phone and considered her to be non-compliant with its reunification efforts.

---

3. DCFS had apparently recommended that Mother call A.S. and S.S. twice a week.

4. Trial Counsel had also represented Mother in her unrelated criminal matters.

¶8　In July 2013, the juvenile court conducted a review hearing; Mother participated telephonically. Despite Mother's assertions that she had been calling A.S. and S.S. and attempting to comply with DCFS's requirements, the juvenile court terminated reunification services and changed the permanency goal for A.S. and S.S. to termination of Mother's and Father's parental rights and adoption. At the July hearing, Mother expressed dissatisfaction with Trial Counsel, stating that she was trying to obtain a different lawyer because Trial Counsel "hasn't been doing a lot."

¶9　In August 2013, the State filed a petition to terminate Mother's parental rights. The petition alleged multiple grounds for termination, including abandonment, neglect, lack of parental adjustment, and failure to remedy the circumstances that led to A.S. and S.S.'s out-of-home placement. The petition contained no allegation that Mother had ever abused A.S. or S.S. Rather, all of the grounds for termination flowed directly or indirectly from Mother's absence from A.S. and S.S.'s lives.

¶10　The juvenile court set November 2013 as the date for the termination of parental rights trial. Mother participated telephonically in two pretrial hearings during September and October. At the October hearing, she stated to the juvenile court that she was in the process of retaining different counsel, explaining that Trial Counsel "hasn't really done anything to help me on this case [and all] he's really actually done is hurt my case."

¶11　Trial was held on November 12, 2013. Mother participated by phone. Trial Counsel was present in person. At the beginning of the trial, Trial Counsel informed the juvenile court that he had received a fax from Mother that morning "asking for a continuance on this case so she can seek better counsel, since her lawyer isn't doing anything at all." In response to the juvenile court's questioning, Mother explained

that she had recently obtained the funds she needed to retain new counsel. The juvenile court denied the request for a continuance on timeliness grounds without inquiring into the reasons for Mother's dissatisfaction with Trial Counsel.[5]

¶12 Trial then commenced. Trial Counsel made no opening statement on Mother's behalf. After its opening statement, the State began submitting documentary exhibits. After the State offered its third exhibit, Trial Counsel announced, "Your Honor, I have seen all the exhibits. I have no objection to any of them. . . . [T]he Court would accept them no matter whether there was an objection or not." The juvenile court responded, "Not necessarily. If you want to make [an objection], make one." Trial Counsel remained silent as DCFS submitted its remaining exhibits, thirty-six in total, and confirmed at the end of the process that he had no objections.

¶13 At trial, the State called Mother's DCFS case worker and A.S. and S.S.'s Wyoming foster mother. The case worker testified about Mother's sporadic communications with A.S. and S.S., Mother's failure to stay in contact with DCFS, and Mother's failure to comply with DCFS's reunification requirements. Trial Counsel raised no objections during the case worker's testimony. Trial Counsel then declined to cross-examine the case worker.

¶14 The foster mother testified about her relationship with A.S. and S.S. and Mother's communications with them. Trial Counsel remained silent during the foster mother's testimony, except when the foster mother offered testimony concerning

---

5. Even though Mother had told the juvenile court at the July and October hearings that she was attempting to retain different counsel, the court stated that Mother had "not mentioned changing attorneys until today." Trial Counsel did not bring this factual inaccuracy to the juvenile court's attention.

pictures of A.S. and S.S. at her home. At this point, Trial Counsel volunteered that he was "willing to stipulate that [A.S. and S.S.] look cute and they're happy in the home." Trial Counsel also commented to the foster mother, "And you do a very excellent job with the camera." Trial Counsel did not raise any objections to the foster mother's testimony and again declined to conduct cross-examination. The State then rested its case.[6]

¶15    The juvenile court asked Trial Counsel if there was anything he would like to present, and Trial Counsel responded, "No, your Honor." The juvenile court then asked Mother if she had anything to say. Mother made a brief statement to the court. Mother began trying to explain that she maintained telephone contact with A.S. and S.S., that she had a suitable home for them in Iowa and was working, and that her children should never have been placed in Wyoming. Trial Counsel did not conduct a direct examination to help Mother present her version of events to the juvenile court. Instead, the State, then the guardian ad litem (the GAL), cross-examined Mother.

¶16    Trial counsel raised no objections during Mother's cross-examination, during which Mother admitted that she had not seen A.S. and S.S. for close to a year. Mother also testified that she "[did not] have the means to come out and see them," that she was expecting them to be sent to her in Iowa under the

---

6. After the State rested, the juvenile court briefly questioned A.S. and S.S.'s foster father, who stated that he agreed with the foster mother's testimony. Trial Counsel did not cross-examine the foster father.

"interstate compound," and that she currently lived in a large house that was suitable for A.S. and S.S.[7]

¶17 After the State and the GAL finished their questioning, Trial Counsel finally decided to question Mother. However, rather than attempt to elicit favorable testimony from Mother or otherwise rehabilitate her case, Trial Counsel questioned Mother regarding her lack of communication with him. When Mother responded that she had tried to call Trial Counsel "a few times," Trial Counsel asked her, "What were the dates that you tried to call my office?" Mother thought she had called Trial Counsel in February, March, and June, and on the day of trial, but had not received return calls. Trial Counsel then asked if Mother had ever written him to inform him of her address. Mother continued to focus on the phone calls, stating, "I never got any return phone calls from you, actually. Like even when—you never even cross examined the witnesses, let alone—" Trial Counsel cut her off, stating, "Nothing further. There's no sense in it, Judge."

¶18 The juvenile court then called for closing arguments, beginning with Trial Counsel. Trial Counsel responded, "Nothing to argue, Judge." The State and the GAL also submitted the matter without closing argument, and the juvenile court issued its oral ruling terminating Mother's parental rights. At the close of its ruling, the juvenile court again inquired if Trial Counsel had anything to add. Trial Counsel responded that he did not. Once the juvenile court turned to the scheduling of a review hearing, Trial Counsel inquired, "Your honor, am I released?" In response, the State indicated that Trial Counsel

---

7. Mother's repeated references to the "interstate compound" apparently refer to the Interstate Compact on the Placement of Children. See Utah Code Ann. §§ 62A-4a-701 to -710 (LexisNexis 2011) (governing the placement of children between states).

would likely need to continue to represent Mother through the possible initiation of an appeal, but the juvenile court released Trial Counsel from attending the review hearing.

¶19   Mother now appeals the juvenile court's order terminating her parental rights to A.S. and S.S.[8]

ISSUE AND STANDARD OF REVIEW

¶20   Mother argues that Trial Counsel failed to provide her with the effective assistance of counsel to which she was entitled. *See In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994) (holding that a parent's statutory right to counsel in termination proceedings guarantees the right to effective counsel). "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162. Because we resolve this appeal on Mother's ineffective assistance of counsel argument, we do not reach her argument that the juvenile court erred in failing to adequately inquire into her dissatisfaction with Trial Counsel at the termination hearing. *See In re C.C.*, 2002 UT App 149, ¶ 10, 48 P.3d 244 (imposing duty on juvenile court to inquire into a parent's expressed dissatisfaction with appointed counsel during termination proceedings).

---

8. We note that Trial Counsel apparently failed to assist Mother with this appeal. Mother initiated this appeal with a pro se letter. The untimeliness of Mother's letter nearly led to the dismissal of this appeal, but the juvenile court extended Mother's time to appeal after finding a breakdown in communication between her and Trial Counsel. The juvenile court also appointed new counsel, who has briefed and argued the appeal on Mother's behalf.

ANALYSIS

¶21 "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also In re E.H.*, 880 P.2d at 13 (adopting the *Strickland* test to determine a claim for ineffective assistance of counsel in proceedings involving termination of parental rights). Here, Mother argues that Trial Counsel's failure to represent her interests at the termination trial fell below reasonable professional standards and significantly undermined the reliability of the trial process. We agree.

¶22 To establish that she is entitled to a new trial based upon Trial Counsel's ineffective assistance, Mother "must show that counsel's performance was objectively deficient and that counsel's deficient performance prejudiced the case." *In re E.H.*, 880 P.2d at 13. "[T]he proper standard for attorney performance is that of reasonably effective assistance," *Strickland*, 466 U.S. at 687, and to demonstrate deficient performance, Mother must show that Trial Counsel's representation "fell below an objective standard of reasonableness," *id.* at 688.

¶23 Mother has shown that Trial Counsel's performance at trial was objectively deficient.[9] Trial Counsel failed to make an opening argument summarizing Mother's case against termination, failed to cross-examine the State's witnesses, failed to present evidence in Mother's favor through Mother's testimony or otherwise, and declined to make a closing

---

9. Mother also complains that Trial Counsel did nothing to assist her prior to the termination trial. We examine only Trial Counsel's performance at trial.

argument with the comment that there was "[n]othing to argue." Trial Counsel's only affirmative actions at trial were (1) telling the juvenile court that he would not object to the admission of documents because the court "would accept them no matter whether there was an objection or not"; (2) stipulating that pictures taken by the foster mother showed that A.S. and S.S. were "happy in the [foster] home," as well as complimenting the foster mother's photography skills; and (3) questioning Mother's credibility about her allegations that he had not communicated with her prior to trial.

¶24  The trial transcript reveals that Trial Counsel simply remained silent except when he was declining to act on Mother's behalf, registering non-objection or stipulation to the State's evidence,[10] or examining Mother.[11] Trial Counsel's "willful disregard for [Mother's] case cannot possibly be construed as sound strategy" and "falls far 'below an objective standard of reasonableness.'" *Menzies v. Galetka*, 2006 UT 81, ¶ 96, 150 P.3d 480 (quoting *Strickland*, 466 U.S. at 688). Rather, we can only characterize Trial Counsel's performance at trial as an "abdication of advocacy." *Menzies v. State*, 2014 UT 40, ¶ 183, 344 P.3d 581 (citation and internal quotation marks omitted).

---

10. Mother has not established that Trial Counsel's non-objections or stipulations were professionally unreasonable in and of themselves. We identify them only to complete the short list of actions that Trial Counsel actually undertook during Mother's trial.

11. In stark contrast to his reticence during trial, once the juvenile court rendered its decision terminating Mother's parental rights at the end of trial, Trial Counsel immediately requested that he be released from his representation of Mother.

¶25     The State argues that Trial Counsel's performance must be viewed against the backdrop of Mother's intransigence. The State claims that "any deficit in [Trial Counsel's] performance was directly attributable to Mother's complete failure to communicate with him." Indeed, the record reveals a strained and difficult relationship between Trial Counsel and Mother. The State lays the blame for the breakdown at Mother's feet and argues that Mother "has manufactured a claim of ineffectiveness by creating a situation in which it would be virtually impossible for any lawyer to provide the very best representation." *Strickland* does not, of course, require "the very best representation"; it does, however, mandate objectively reasonable performance. 466 U.S. at 688. Even if we were to concur with the State that Mother was responsible for the strained relationship, we cannot accept the State's argument that this difficulty made it objectively reasonable for Trial Counsel to do nothing at all to advance his client's interests.

¶26     We also acknowledge the GAL's argument that "'[s]ilence can constitute trial strategy,' particularly where the evidence is overwhelming against the defendant." (Quoting *Warner v. Ford*, 752 F.2d 622, 625 (11th Cir. 1985).) Here, however, the evidence in favor of termination of Mother's parental rights was not overwhelming. Mother had never abused A.S. or S.S. and was not subject to the kind of long-term incarceration that would preclude reunification. There is also no suggestion in the record or the State's petition that Mother had substance-abuse issues.

¶27     Rather, the State's grounds for termination were all based, directly or indirectly, on the separation between Mother and the children that resulted from Mother's move to Iowa and the children's placement in Wyoming. We see no valid trial strategy in Trial Counsel's refusal to at least explore the contacts Mother

had with A.S. and S.S.,[12] the efforts she had made to create a stable environment for her children in Iowa, and her desire to retain her parental rights. Further, Trial Counsel did not employ a "silence strategy," but rather elected to call Mother's credibility into question and affirmatively represented to the juvenile court that he had "[n]othing to argue." In other words, not only did Mother lack an advocate in the courtroom, but her own attorney appeared to take an adversarial position against her. This was objectively unreasonable and denied Mother the effective counsel Utah law guarantees to a defendant facing the loss of her parental rights. *See* Utah Code Ann. § 78A-6-1111(1) (LexisNexis Supp. 2014) (establishing a parent's right to counsel at termination proceedings).

¶28　To establish her claim of ineffective assistance of counsel, Mother must also demonstrate that Trial Counsel's performance resulted in prejudice to her case. *See In re E.H.*, 880 P.2d 11, 13 (Utah Ct. App. 1994). Thus, Mother "must show that there is a reasonable probability that, but for [Trial Counsel's] unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). "A reasonable probability is a probability sufficient to undermine [our] confidence in the outcome." *Id.*

¶29　Trial Counsel's complete lack of advocacy for Mother during the termination trial undermines our confidence in the result.[13] A competent presentation of Mother's version of events

---

12. For example, the contact log prepared by the foster mother showed that Mother had contacted A.S. and S.S. nearly weekly in the two months preceding the State's filing of the termination petition.

13. The concurring opinion asserts that "the juvenile court seems to have correctly determined that Mother failed to show the

(continued…)

could have explained her actions in such a light that there is a reasonable probability of a more favorable result for Mother.

¶30 For example, the juvenile court concluded that Mother had "failed to communicate with her children in any way in excess of six months and failed to show the normal interest of a natural parent." Had Trial Counsel performed effectively, he could have elicited testimony that the records the foster parents maintained demonstrated that Mother had made almost weekly calls to the children for a number of months. Trial Counsel also could have argued that Mother's frequent reference to her belief that the "interstate compound" provided her a mechanism to regain custody of her children was inconsistent with a finding of abandonment or a finding that Mother had failed "to have shown the normal interest of a natural parent, without just cause." *See* Utah Code Ann. § 78A-6-508(1)(c) (LexisNexis Supp. 2014). Similarly, the juvenile court found, citing Utah Code section 78A-6-508(2)(d), that Mother had shown "repeated or

---

(…continued)

normal interest of a natural parent and could not demonstrate sufficient just cause to excuse her failures." See infra ¶ 34. Trial Counsel's failure to represent Mother helped create the record that the concurring opinion relies on to reach its conclusion about the propriety of the juvenile court's decision. The concerns we have about Trial Counsel's representation undermine our confidence that Mother's story was fully presented. For example, we do not know what Mother might have offered to demonstrate "just cause" for the decisions she made had she been appropriately represented. Given the importance of the fundamental interests at stake, we believe the more prudent course of action is to await a record developed with the assistance of the counsel Utah law guarantees before assessing whether the juvenile court properly terminated Mother's parental rights.

continuous failure to provide the children with food, clothing, shelter, education, or other care necessary for the children's physical, mental, and emotional health and development." *See id.* § 78A-6-508(2)(d). There is a reasonable likelihood of a different result had Trial Counsel elicited Mother's testimony concerning the efforts she had undertaken in Iowa in hopes of creating a stable environment there for all of her children.

¶31    Trial Counsel's deficient performance not only precluded Mother from completely and competently presenting her story to the juvenile court, but Trial Counsel affirmatively undercut Mother's case. Trial Counsel's examination of Mother was a direct attack on her credibility. The juvenile court's termination order expressly found that Mother's testimony lacked credibility. The Utah Supreme Court has recognized that deficient performance that diminishes a party's credibility can be prejudicial. *See State v. Lenkart*, 2011 UT 27, ¶ 41, 262 P.3d 1 (discerning prejudice where unoffered testimony "would have shifted the credibility scale in [the defendant's] direction, thus changing the entire evidentiary picture at trial"). Here, any possibility of a successful result for Mother hinged on the juvenile court believing Mother's explanations for her actions. Trial Counsel's examination diminished Mother's credibility before the juvenile court and thereby decreased the possibility of a more favorable result.[14] *Cf. id.*

¶32    Mother has shouldered her burden on appeal of demonstrating that Trial Counsel provided her with objectively

---

14. Other aspects of Trial Counsel's deficient performance only reinforced and magnified this prejudice, including his failure to make an opening statement, his abrupt termination of his examination of Mother with the comment "[t]here's no sense in it," and his representation to the juvenile court that there was "[n]othing to argue" in Mother's favor.

deficient assistance at her termination trial and that his performance prejudiced her case. She has thus established that she was deprived of the effective assistance of counsel that Utah Code section 78A-6-1111 guaranteed her.

## CONCLUSION

¶33   Trial Counsel rendered ineffective assistance of counsel by failing to represent Mother's interests in the trial to terminate her parental rights. At trial, Mother wanted to explain her actions to the juvenile court. Trial Counsel's failure to advocate largely prevented Mother from doing so. Further, to the extent that the juvenile court allowed Mother to tell her story without the assistance of Trial Counsel, Trial Counsel diminished her credibility with his own comments and examination of Mother. We conclude that Trial Counsel's actions fell below reasonable professional standards of representation and undermine our confidence in the result the juvenile court reached. Accordingly, Mother received ineffective assistance of counsel and is entitled to a new trial. We reverse and remand for further proceedings.

————————

CHRISTIANSEN, Judge (concurring):

¶34   I concur with the majority's opinion that Mother received ineffective assistance of counsel and that the juvenile court's termination order should be reversed. I write separately, however, because I am much less convinced than my colleagues that Trial Counsel's lack of representation throughout the proceedings and at trial produced an unjust result. I find more compelling than my colleagues the argument presented by the State and the GAL that Mother's failure to parent created a pattern of parental absenteeism that foreclosed the opportunity for even competent counsel to change the outcome of this case. Though Mother did not physically abuse her children or have

diagnosed substance-abuse or mental health issues,[15] in the context of the abandonment and neglect at issue here, I believe the record demonstrates that Mother consciously disregarded her parental obligations and failed to maintain a relationship with her children. *See* Utah Code Ann. § 78A-6-508(1) (LexisNexis Supp. 2014). In my opinion, given the young ages of S.S. and A.S., the majority only cursorily considers the impact of Mother's purposeful and intentional move from Utah to Iowa at the beginning of 2013 to be close to her older children. This move occurred at a point in time when S.S. was only six months old and A.S. was only two and one-half years old—critical developmental periods during which a child would be expected to naturally and normally bond closely with his or her caregivers. Even if Mother had the assistance of counsel to help explain her decision to move away from the children, the juvenile court seems to have correctly determined that Mother failed to show the normal interest of a natural parent and could not demonstrate sufficient just cause to excuse her failures.

¶35    Specifically, when Mother chose to move out of state away from her young children, she was still in a position to fully comply with the Child and Family Plan in order to be reunified with S.S. and A.S. The evidence produced at trial demonstrates that after she moved to Iowa, Mother did not work with or stay in contact with DCFS, did not pay child support, did not send gifts or cards to her children, did not maintain a stable address or otherwise comply with her service plan, and continued to engage in anti-social and criminal behavior. All of these failures to comply with her Child and Family Plan compounded the

---

15. The majority opinion states that there is no suggestion in the record that Mother had substance-abuse issues. See supra ¶ 26. However, Mother's Child and Family Plan required her to undergo random drug tests and obtain a mental health assessment.

problem of physical separation and an inability to verbally communicate with her baby and toddler. Also at trial, Mother acknowledged that she had not had face-to-face contact with her two young children in nearly a year. While there is no universal standard for what constitutes a normal parental relationship, a parent is required to support, communicate, and bond with his or her child to maintain an appropriate parent-child relationship. *See In re T.E.*, 2011 UT 51, ¶¶ 20–21, 266 P.3d 739. By purposefully removing herself from the state in which her children resided, and by failing to recognize her children's developmental bonding needs, Mother created a situation that did not allow her to have much, if any, continued relationship with her young children. Mother's own actions appear to demonstrate her abandonment and neglect of S.S. and A.S. Therefore, I am not completely convinced that Trial Counsel's unprofessional errors caused actual prejudice by changing the result of this case.

¶36 However, though I find compelling the State's and the GAL's arguments that much of the responsibility for Mother's abandonment and neglect of S.S. and A.S. appears to lie with Mother and her choices, the record supports our determination that Trial Counsel's representation in this case was woefully deficient and actually adversarial to Mother. Because "a parent possesses a fundamental liberty interest in the care, custody, and management of the parent's child," Utah Code Ann. § 78A-6-503 (LexisNexis Supp. 2013), the State bears the burden of proving by clear and convincing evidence that grounds exist to terminate parental rights and that termination of parental rights is in the best interest of the children, *see id.* § 78A-6-506 (2012). Given the importance of parental rights and the high burden of proof required to terminate those rights, *see In re J.P.*, 648 P.2d 1364, 1376–77 (Utah 1982), Trial Counsel's lack of any advocacy on Mother's behalf cannot be excused here. Though I tend to believe the juvenile court may have reached the right decision in this case, I agree that "Mother has shouldered her burden on appeal

of demonstrating that Trial Counsel provided her with objectively deficient assistance." *See supra* ¶ 32. Accordingly, Mother should have a new trial with representation by competent counsel at which she can attempt to demonstrate just cause for her decisions.

———————